UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| UNITED STATES SECURITIES )<br>AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FRANK A. DUNN, DOUGLAS C. BEATTY, )<br>MICHAEL J. GOLLOGLY and MARYANNE E. )<br>PAHAPILL (a.k.a. MARY ANNE POLAND) )<br>)<br>Defendants. )<br>_____) | Civil Action No. 07-CV-2058<br><br>(ECF CASE)<br><br>COMPLAINT<br>SECURITIES FRAUD |

The United States Securities and Exchange Commission (the "Commission") alleges that:

<u>SUMMARY</u>

1.      This case involves a fraudulent scheme led by four top executives and finance managers of Nortel Networks Corporation ("Nortel or "the Company"), beginning no later than September 2000, to manipulate Nortel's accounting in order to (i) meet the unrealistic revenue and earnings guidance that these executives had provided to Wall Street, (ii) create the false appearance that, because of their leadership and planning, Nortel was weathering the economic downturn better than its competitors, (iii) create the later false appearance that, because of their leadership and planning, Nortel had stabilized and returned to profitability for the first time in over three years and (iv) to pay bonuses to themselves and other Nortel executives.

2.      In the late 1990s, the United States economy experienced substantial and rapid growth in the telecommunications and internet sectors.  In 2000, however, those sectors contracted significantly.  Demand for such products waned.  Access to capital was severely constricted.  By September 2000, Nortel's revenues began to slip from internally budgeted

amounts by hundreds of millions of dollars.  Orders began to soften and anticipated revenues

from many customers failed to materialize.  By mid-October 2000, Nortel's finance managers

and executives estimated that the Company's results were falling short of its 2000 revenue goals

by almost $2 billion, and anticipated a similar shortfall in the first half of 2001.

3.      Both Nortel's competitors and its customers were similarly affected by this dramatic

slowdown.  Nortel, however, did not share its bad news with Wall Street.  Instead, Nortel

continued to claim that it would experience substantial growth for the remainder of 2000 and into

2001, despite its internally-reduced expectations.

4.      Starting no later than October 2000, defendant Frank A. Dunn ("Dunn"), Nortel's

Chief Financial Officer ("CFO") and later its President and Chief Executive Officer ("CEO"),

responded to market pressures by engaging in a fraudulent accounting scheme in which Dunn

and others (i) primed Wall Street's expectations by issuing unrealistic financial guidance for

Nortel and (ii) then used accounting adjustments that violated US Generally Accepted

Accounting Principles ("US GAAP") to move Nortel's revenues and earnings upward or

downward as necessary to meet Wall Street's unrealistic expectations.  Dunn was joined in this

scheme by (a) defendant Douglas C. Beatty ("Beatty"), Nortel's Controller and later its CFO,

(b) defendant Michael J. Gollogly ("Gollogly"), Beatty's successor to the position of Controller,

(c) defendant MaryAnne E. Pahapill (a.k.a. MaryAnne Poland) ("Pahapill"), Nortel's Assistant

Controller and Vice President of Corporate Reporting and later its Controller, and (d) other

financial managers.

5.      Defendants' scheme took two forms:

6.      From the third quarter of 2000 through the first quarter of 2001, when Nortel reported

its financial results for year-end 2000, Dunn (then CFO), Beatty (then Controller) and Pahapill

(then Assistant Controller) altered Nortel's revenue recognition policies to accelerate revenues

(particularly revenues of Nortel's optical internet business, which were closely watched by Wall Street) as needed to meet Nortel's quarterly and annual revenue guidance, and to hide the worsening condition of Nortel's business.  Bill and hold transactions were at the center of the scheme.  US GAAP permits a company to recognize revenues prior to delivery of a product if the bill and hold transaction has been structured properly.  In the second quarter of 2000, Nortel banned the use of such transactions, but, when Nortel's revenues fell significantly short of expectations in the third quarter of 2000, Dunn, Beatty and Pahapill reintroduced bill and hold transactions into the Company's sales and accounting practices specifically to recognize revenues on idle, undelivered inventory sitting in Nortel's warehouses and offsite storage locations.  The transactions did not satisfy US GAAP requirements but Nortel nonetheless recognized revenues as if they did.  In all, Nortel accelerated into 2000 more than $1 billion in revenues through its improper use of bill and hold transactions.  Dunn, Beatty and Pahapill not only were able to steer Nortel's results for the fourth quarter and fiscal year 2000 in line with Wall Street's expectation, but also, they were able to show a sizable increase in optical revenues. Nowhere was the existence or effect of Dunn, Beatty and Pahapill's accounting scheme disclosed to Nortel's shareholders, the market or the Company's independent auditors.

7.    Beginning in February 2001, Nortel suffered serious losses when it finally lowered its guidance to account for the fact that its business was suffering from the same widespread economic downturn that impacted the entire telecommunications industry.  As Nortel's business plummeted throughout the remainder of 2001, the Company reacted by implementing a restructuring that, among other things, reduced its workforce by two-thirds and resulted in a significant write-downs of assets.  Dunn became Nortel's President and CEO in the midst of the restructuring.  In the summer of 2002, as Nortel began to emerge from the downturn, Dunn publicly announced that he expected Nortel to return to profitability by the second quarter of

2003.  Assisted by defendants Beatty (then CFO) and Gollogly (then Controller), Dunn then embarked on a second scheme – the manipulation of Nortel's reserves – to manage Nortel's publicly-reported earnings, create the false appearance that his leadership and business acumen was responsible for Nortel's profitability and to pay bonuses to these three defendants and other Nortel executives.

8.     From at least July 2002 through June 2003, Dunn, Beatty and Gollogly improperly established, maintained and released excess reserves to meet Dunn's unrealistic and overly aggressive earnings targets.  When Nortel internally (and unexpectedly) determined that it would return to profitability in the fourth quarter of 2002, sooner than Dunn had indicated in his guidance to the investment community, Dunn, Beatty and Gollogly established and maintained excess reserves in order to reduce earnings for the quarter, avoid reporting a profit earlier than Dunn had publicly predicted, and to create a stockpile of reserves that could be (and were) released in the future as necessary to meet Dunn's prediction of profitability by the second quarter of 2003.  When 2003 turned out to be rockier than expected, Dunn, Beatty and Gollogly orchestrated the release of excess reserves to cause Nortel to report a profit in the first quarter of 2003, a quarter earlier than the public expected, and to pay defendants and others substantial bonuses that were awarded for achieving profitability on a *pro forma* basis.  Dunn publicly attributed Nortel's first quarter 2003 return to profitability to the strength of his business model. Dunn, Beatty and Gollogly again planned to release excess reserves to achieve profitability in the second quarter of 2003, but, because their actions drew the attention of Nortel's outside auditors, they made only a portion of the planned reserve releases.  This allowed Nortel to report nearly break-even results (though not actual profit) and to show internally that the Company had again reached profitability on a *pro forma* basis necessary to pay bonuses.

9.      In the second half of 2003, Nortel's outside auditors raised concerns about Nortel's handling of reserves and, from that point forward, defendants' scheme began to unravel.  To appease the auditors, Nortel's management – led by Dunn and Beatty – conducted a purportedly "comprehensive review" of Nortel's assets and liabilities.  This resulted in an announcement, on October 23, 2003, that Nortel would restate its financials for fiscal years 2000, 2001 and 2002.

10.     On November 19, 2003, Nortel filed its quarterly report on Form 10-Q for the period ending September 30, 2003, which restated approximately $948 million in total liabilities (the "First Restatement").  The Company then amended its 2002 Form 10-K and its Form 10-Qs for the first and second quarters of 2003 in late December 2003.  The First Restatement, in reality, was a cover-up.  The supposedly "comprehensive review" consisted of a superficial and sharply limited review of reserves.  It did not in any way address the revenue recognition fraud that Dunn, Beatty and Pahapill had engaged in for the fourth quarter of 2000.  Moreover, because of the restricted focus of the review, the First Restatement also did not capture a significant number of the improper reserve setups and releases that Dunn, Beatty and Gollogly had orchestrated in the fourth quarter of 2002 and the first and second quarters of 2003.  This, in turn, concealed any pattern of fraud in the liabilities Nortel restated.  Dunn and Beatty were able to, and did, continue to mislead the public by claiming that the First Restatement was simply a result of accounting errors that had been made during a volatile period when demand for Nortel's products dropped and the Company underwent a restructuring.

11.     Shortly after Nortel announced on October 23, 2003 that it needed to restate its financial statements, the Audit Committee of Nortel's Board of Directors ("Audit Committee") commenced an independent investigation and hired outside counsel to help the Audit Committee "gain a full understanding of the events that caused significant excess liabilities to be maintained on the balance sheet that needed to be restated," as well as to recommend any necessary remedial

measures.  The investigation uncovered evidence that Dunn, Beatty and Gollogly, and certain

other financial managers, were responsible for Nortel's improper use of reserves in the second

half of 2002 and first half of 2003.

12.     In March 2004, Nortel suspended Beatty and Gollogly, and announced that it would

"likely" need to further revise and restate previously filed financial results.  Dunn, Beatty and

Gollogly were terminated for cause in April 2004.  Nortel announced it would restate its results a

second time and expected to cut its 2003 earnings by half.

13.     On January 11, 2005, Nortel issued a "Second Restatement," which restated

approximately $3.4 billion in misstated revenues and at least another $746 million in liabilities.

All of the financial statement effects of defendants' two accounting fraud schemes were

corrected as of this date, albeit, there remained lingering effects from defendants' internal control

and other non-fraud violations.  Nortel also disclosed the findings to date of the Audit

Committee's independent review, which concluded, among other things, that Dunn, Beatty and

Gollogly were responsible for Nortel's improper use of reserves in the second half of 2002 and

first half of 2003.  The Second Restatement, however, did not reveal that Nortel's top executives

had also engaged in revenue recognition fraud in 2000.

14.     In May 2006, in its Form 10-K for the period ending December 31, 2005 ("2005

Form 10-K), Nortel admitted for the first time that its restated revenues in part had resulted from

management fraud, stating that "in an effort to meet internal and external targets, the senior

corporate finance management team … changed the accounting policies of the Company several

times during 2000," and that those changes were "driven by the need to close revenue and

earnings gaps."

15.     Throughout their scheme, defendants lied to Nortel's independent auditor by making

materially false and misleading statements and omissions in connection with the quarterly

reviews and annual audits of the financial statements that were materially misstated.  Among other things, each of the defendants submitted management representation letters to the auditors that concealed the fraud and made false statements which included that the affected quarterly and annual financial statements were presented in conformity with US GAAP and that they had no knowledge of any fraud that could have a material affect on the financial statements.  Dunn, Beatty and Gollogly also submitted a false management representation letter in connection Nortel's First Restatement, and Pahapill likewise made false management representations in connection with Nortel's Second Restatement.

16.     Defendants' scheme resulted in Nortel issuing materially false and misleading quarterly and annual financial statements and related disclosures for at least the financial reporting periods ending December 31, 2000 through December 31, 2003, and in all subsequent filings made with the Commission that incorporated those financial statements and related disclosures by reference.

17.     By engaging in such conduct, Dunn, Beatty, Gollogly and Pahapill violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2].  In addition, Dunn and Beatty violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].  Through their conduct, each defendant also aided and abetted Nortel's violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (B)] and Exchange Act Rules 12b-20, 13a-1, 13a-13 [17 C.F.R. §§ 12b-20, 240.13a-1, 240.13a-13, 240.13b2-1 and 240.13b2-2].

18.     Unless enjoined, Dunn, Beatty, Gollogly and Pahapill are likely to commit such violations in the future.  They should be permanently enjoined from doing so, ordered to disgorge any ill-gotten gains or benefits derived as a result of their violations (whether realized,

unrealized or received), and prejudgment interest thereon, and be ordered to pay appropriate civil money penalties.  In addition, the defendants should be prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)].

## JURISDICTION AND VENUE

19.     The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77t(b)], and Section 21(d) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78u(d)].

20.     This Court has jurisdiction over this action under Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§ 77t(b) and 77v(a)] and Exchange Act Sections 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa].

21.     Venue is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a) and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices and courses of conduct alleged herein, which constitute violations of the Securities Act and Exchange Act, occurred within the Southern District of New York, including, but not limited to, transactions in Nortel's common stock were executed through the facilities of the New York Stock Exchange.

22.     The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of conduct alleged herein.

## THE DEFENDANTS

23.     **Frank A. Dunn**, 53, is a Canadian citizen last known to be residing in Ontario, Canada.  Dunn, a Certified Management Accountant, spent his entire career with Nortel and its predecessor companies after graduating from college in 1976.  He was CFO of Nortel from

March 2000 to October 31, 2001 and was Acting CFO from February 2002 to July 2002. He became Nortel's President and CEO effective November 1, 2001. He was a director of Nortel beginning in May 2000. Dunn was terminated for cause as President and CEO on April 28, 2004 and he resigned as a director effective May 21, 2004.

24.     **Douglas C. Beatty**, 52, is a Canadian citizen and Chartered Accountant last known to be residing in Ontario, Canada. Beatty joined Northern Telecom (Nortel's predecessor) in October 1986 and worked there until December 1995, when he left to work for another company. He returned to Nortel in March 1999 to become its Controller. He was promoted to CFO of Nortel on July 17, 2002. Beatty was placed on leave of absence on March 15, 2004 and, on April 28, 2004, he was terminated for cause.

25.     **Michael J. Gollogly**, 48, is a Canadian citizen and Chartered Accountant last known to be residing in Ontario, Canada. Gollogly joined Northern Telecom (Nortel's predecessor) in October 1996 as an Assistant Vice President for Corporate Reporting and subsequently held various positions within the Company. He became Nortel's Controller in July 2002. Gollogly was placed on leave of absence on March 15, 2004 and, on April 28, 2004, he was terminated for cause.

26.     **MaryAnne E. Pahapill (a/k/a Mary Anne Poland)**, 46, is a Canadian citizen and Chartered Accountant last known to be residing in Ontario, Canada. Pahapill joined Northern Telecom (Nortel's predecessor) in April 1998 as its Vice President of Corporate Reporting. She was given the additional title of Assistant Controller in February 1999, and held those positions until May 2001. She also served as Nortel's Controller from March 15, 2004 until her resignation, which became effective February 7, 2005. On September 15, 2006, Pahapill notified a Commission staff attorney that she has "reverted" to her legal maiden name of "Mary Anne Poland."

## OTHERS

27.     **Nortel Networks Corp. ("Nortel")** is a Canadian corporation, with principle executive offices in Toronto, Ontario, Canada.  Nortel's business consists of the design, development, assembly, marketing, sale, licensing, installation, servicing and support for networking solutions.  Nortel's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) and trades publicly on the New York and Toronto Stock Exchanges under the symbol "NT."  Nortel has also periodically issued in the United States debt securities that trade on the New York Stock Exchange.

28.     **Nortel Networks Ltd. ("NNL")**, a Canadian corporation located in Toronto, Ontario, Canada, is the principle operating subsidiary of Nortel.  NNL's common stock is wholly owned by Nortel and its financial statements are reported on a consolidated basis with Nortel's.  NNL also files periodic reports with the Commission under its own name.  It is a guarantor of certain Nortel debt securities that are registered with the Commission and that trade on the New York Stock Exchange.

## THE DEFENDANTS' FRAUDULENT SCHEMES

29.     Nortel's top executives long instilled the Company with an extremely target-driven culture. It was understood across the Company that either missing or exceeding a financial target reflected a failure to manage the Company's business properly.   Dunn, as CFO and later as President and CEO, reinforced this culture by, among other things, reviewing and inquiring about particular accounting entries during the quarterly and year-end closing processes, and, more generally, through his constant emphasis on the importance of hitting targets and his well-known disregard for internal accounting and financial controls.  In that environment, accounting did not serve to measure Nortel's performance; instead, Nortel's executives and finance managers treated their books as tools to meet the Company's financial objectives.

30.     In January 2000, Nortel began reporting its results under US GAAP.  It did not, however, update the Company's internal accounting guidelines to conform to US GAAP and, at best, offered sporadic and superficial training to employees.  This was by design.  Nortel's senior finance executives maintained the ability to and did selectively apply or disregard US GAAP concepts as desired to meet Nortel's financial targets.

### A.     The First Scheme: Revenue Recognition Fraud

31.     On July 25, 2000, in an earnings release which Dunn reviewed and approved, Nortel made public its financial results for the second quarter of 2000 ("Second Quarter 2000 Earnings Release") and announced that it was raising its outlook for the remainder of 2000.  The Company's revised outlook primed the market to expect revenue growth from Nortel that exceeded 40 percent for the year, up from Nortel's previous guidance of 30 to 35 percent, and to expect operating earnings growth in the "high 30s."  Dunn participated in an earnings conference with analysts on the same day ("Second Quarter 2000 Earnings Call"), in which Nortel attributed its second quarter results and its newly-announced expectation for the year to its optical business:

> This is being driven obviously by a very, very strong performance of our optical business.  Revenue growth in optical in [the second] quarter was, once again, 150%.  I think the last time that we had this call we talked about our ambitions to break $10 billion of shipments in optical business this year.  Now we feel quite comfortable we'll exceed that number and we'll have a number for the year that will be somewhere north of $10 billion of shipment for the year.

Nortel's then-CEO, John Roth, even suggested in September 2000, that optical revenues might possibly reach $12 billion.  The Second Quarter 2000 Earnings Release also attributed Nortel's revised growth expectations to "the momentum we have been experiencing during the first half of this year, supported by an 85 percent increase in order input and a 1.35 book to bill in the

quarter." With respect to the third quarter of 2000, Dunn told analysts: "We are gaining momentum so we do have a very solid quarter coming."

### 1.   *Third Quarter 2000: Dunn And Others Withhold Nortel's Changing Internal Expectations From The Public*

32.     Not long after its release of second quarter 2000 financials, Nortel experienced an extreme softening of orders, which, in turn, caused it to revise internally its expectations for the remainder of the year. Dunn was informed of this no later than September 15, 2000. On that date, Dunn received from one of Nortel's finance vice presidents a set of charts – containing internal forecasts for the business units – which showed that Nortel was expected to miss third quarter 2000 revenue targets by at least $405 million, and third quarter 2000 earnings targets by at least $506 million. The finance vice president succinctly described the situation to Dunn as follows: "Frank, as discussed. Its [sic] not pretty."

33.     By October 17, 2000, Nortel determined that its yearly revenues were off by more than $1 billion from expectations. Nortel's business unit finance personnel noted:

- "Lost $1.9 [billion in] 2nd half [2000] revenue over last 4 weeks";

- "Margin shows no sign of recovery"; and

- "1st half 2001 already $1.5 [billion] off expectation."

Anticipated orders from multiple large customers were falling from expectations in some cases by hundreds of millions of dollars. The optical sales forecast was at least $500 million below the $10 billion to $12 billion level for which Nortel had primed the market. It was also estimated by this point that third quarter 2000 revenues would be $900 million less than Nortel had originally budgeted. Further, as of October 17, 2000, Nortel's expected fourth quarter 2000 earnings were at least $320 million short of the amount needed to meet consensus earnings per share.

34.     Nortel did not share any of this with the public.  Instead, it continued to make optimistic forecasts which, by this point, Dunn knew or was reckless in not knowing could not be met through Nortel's operations alone.

35.     In an earnings release dated October 24, 2000, Nortel made public its financial results for the third quarter of 2000 ("Third Quarter 2000 Earnings Release").  The release reported third quarter revenues of $7.31 billion and net earnings of $574 million (or $0.18 per share).  Dunn reviewed, approved and is quoted in the release.  Although Nortel's earnings for the quarter exceeded analyst expectations by 1 cent per share, analysts had expected third quarter revenues to be in the range of $7.3 billion to $7.8 billion.  When revenues came in at the low end of the range, analysts expressed concern.

36.     During Nortel's October 24, 2000 earnings call ("Third Quarter 2000 Earnings Call"), which Dunn participated in, analysts questioned whether Nortel expected lower sales of optical internet gear for the remainder of 2000.  Dunn responded by reassuring analysts that Nortel expected to sell out of its optical gear in the fourth quarter.  He rejected the suggestion that there was a slow-down in performance or growth and instead partially blamed third quarter results on, among other things: (i) slow installations of optical equipment and (ii) customers who were working through existing supplies but were expected to place sales in the fourth quarter of 2000. Nortel told the public there was no change in its guidance for 2000 and reaffirmed its prior-announced growth expectations for 2000, stating: "We continue to expect that our percentage growth in revenue and earnings per share from operations in 2000 … will be in the low 40's." Nortel also continued to predict that "annual optical equipment sales will surpass $10 billion" in 2000, albeit, there was no mention of the possible $12 billion optical sales figure that Nortel's CEO had mentioned as a possibility in September 2000.   Nortel's stock price fell more than 34 percent over the course of the next two days.

37.     External pressure to increase revenues (particularly from sales of optical equipment, which, at the time, made up a significant portion of Nortel's revenues and were closely followed by analysts) mounted.  Nortel – through the actions of Dunn, Beatty and Pahapill – embarked on a scheme to manipulate its results for the remainder of 2000 through accounting changes.

### 2.     *Fourth Quarter 2000: Dunn, Beatty and Pahapill Manipulate Nortel's Revenue Recognition Policies To Meet Targets*

38.     In late October 2000, Beatty held meetings with Pahapill and other senior finance managers to discuss ways to increase Nortel's revenues (and particularly its optical equipment revenues) for the remainder of 2000.  Among the issues discussed were Nortel's then-current revenue recognition policies and their effect on Nortel's ability to reach its 2000 revenue targets.

39.     Beatty and Pahapill – and other finance managers – were particularly eager to find a solution for the hundreds of millions of dollars in inventory (primarily optical inventory) that was sitting in Nortel's warehouses and offsite storage locations.  Revenues could not be recognized for this inventory because US GAAP revenue recognition rules generally require goods to be delivered to the buyer before revenue can be recognized.

40.     This inventory grew, in part, because orders were slowing and, in June 2000, Nortel had banned bill and hold transactions from its sales and accounting practices.  A bill and hold transaction is one where the customer agrees to purchase a product but the seller (here Nortel) retains physical possession until the customer can accept delivery.  US GAAP permits revenue from a bill and hold transaction to be recognized prior to delivery, if certain stringent criteria, described in Paragraph 42 below, are met.  Additionally, once revenues are recognized, the product no longer appears on the seller's books as inventory.  Beatty and Pahapill – with Dunn's knowledge and acquiescence – had banned bill and hold transactions in June 2000 because they had concluded that US GAAP requirements for such transactions were too difficult to meet, that

such transactions were being "scrutinized" by the Commission, and also because second quarter 2000 revenues were sufficiently robust without the use of such transactions. However, throughout the third and fourth quarters of 2000, as revenue pressures increased, various parts of Nortel's business pushed for a repeal of the ban because it prevented Nortel from recognizing significant revenues and hampered its ability to move inventory off its books. The ban on bill and hold transactions was short-lived.

### a.    *Reintroduction Of Bill And Hold Transactions*

41.    In late October 2000, as a first step toward re-introducing bill and hold transactions into Nortel's sales and accounting practices, Beatty and Pahapill asked Deloitte to explain "[u]nder what circumstances can revenue be recognized on product (merchandise) that has not been shipped to the end customer?" Deloitte put together a presentation on, among other things, bill and hold transactions. Specifically, on November 2, 2000, Deloitte presented to Beatty and Pahapill a set of charts explaining the US GAAP criteria that must be met in order for revenues to be recognized prior to delivery under a bill and hold transaction.

42.    US GAAP permits revenue from a bill and hold transaction to be recognized prior to delivery of the goods only if certain stringent criteria are met, including: (i) risk of ownership must have passed to the buyer; (ii) the buyer must have made a fixed commitment to purchase the goods; (iii) the buyer (not the seller) must request the transaction be on a bill and hold basis and must have a substantial business purpose for ordering the goods on a bill and hold basis; (iv) there must be a fixed schedule for delivery of the goods; (v) the seller must not have retained any specific performance obligations such that the earnings process is not complete; (vi) the ordered goods must be segregated from the seller's inventory and not used to fill other orders; and (vii) the goods must be complete and ready for shipment. Also relevant to the analysis is whether the seller has modified its normal billing terms, whether the buyer has the expected risk

of loss in the event of a decline in the market value of the goods, and whether the seller's custodial risks are insurable and insured.  If all of the above criteria are not met, revenue recognition must be deferred until either the bill and hold criteria have been satisfied or physical delivery has occurred.

43.     Beatty and Pahapill ignored Deloitte's guidance and drafted their own revenue recognition guidance for bill and hold transactions.  On November 7, 2000, Pahapill distributed to certain accounting and finance personnel charts that reflected the new guidance.  These charts omitted any mention of the US GAAP criteria that Deloitte had explained.  Indeed, prior to November 7, 2000, Deloitte had reviewed the charts and warned Pahapill that the guidance was too brief and did not give the intended users – Nortel's customer account managers and its accounting and finance personnel – sufficient information to always make the correct assessment of the appropriate accounting.

44.     Deloitte asked Pahapill to distribute its guidance as well.  Pahapill declined.  She deflected Deloitte's concerns by asserting that her charts were merely tools meant to encourage Nortel's accounting and finance personnel to bring questions to her about revenue recognition. The truth was very different.  Pahapill concealed the fact that Nortel intended to urge multiple customers to enter into bill and hold transactions in order to boost fourth quarter 2000 revenues, and that the charts would be distributed to Nortel personnel as part of that effort.

45.     Beatty and Pahapill's brief and incomplete accounting guidance – which reintroduced bill and hold transactions into Nortel's sales and accounting practice in November 2000 – omitted any mention of the strict conditions for recognizing revenue under such agreements.  By choosing not to explain US GAAP requirements for bill and hold transactions to Nortel's employees, Beatty and Pahapill removed barriers that would have prevented Nortel's employees from structuring the transactions in the manner they ultimately did.  Beatty and Pahapill thereby

retained the ability to control the accounting for bill and hold transactions and to manipulate

Nortel's revenues as necessary to meet Nortel's publicly-announced targets.  Dunn knew or was

reckless in not knowing of the existence and purpose of this accounting change, which not only

was designed to help Nortel meet its public forecasts for 2000, but also, would help Nortel show

improvement in its inventory levels, including its inventory of optical equipment, which had

been such a strong focus of the third quarter earnings conference.

46.     On November 8, 2000, Beatty held a conference call with recipients of the revenue

recognition guidance charts to answer any questions raised by the new guidance.  Beatty

explained to call participants that Nortel was having difficulty meeting its fourth quarter 2000

targets and that the bill and hold transactions were being reintroduced to assist Nortel in meeting

its revenue targets.  Beatty directed the call participants to formulate a plan to implement the new

guidance.

47.     A few days after the November 8, 2000 conference call, accounting and finance

employees sent to Beatty and Pahapill a plan for Nortel's sales force to approach certain Nortel

customers and urge them to execute so-called "risk of loss letters" (Nortel's parlance for bill and

hold transactions) for undelivered inventory.  The plan was to identify customers who would

most likely not take delivery of ordered inventory by year end.  Beatty and Pahapill understood

that the proposed plan would lead to transactions that were not consistent with US GAAP, or

Deloitte's guidance, but, they allowed the plans to go forward and thereby set Nortel's fraud in

motion.

48.     Starting in November 2000, Nortel salesmen systematically approached Nortel

customers and urged them to execute risk of loss letters, in complete disregard for US GAAP

requirements.  Customers which had previously placed orders were approached and asked to

restructure their agreements.  Customers which told Nortel they expected to place orders and

take delivery in 2001 were provided incentives to execute risk of loss letters in 2000. New customers were asked to execute risk of loss letters too. Nortel induced customers with offers of price discounts, interest deferments and extended billing terms. The vast majority of transactions entered into had no substantial business purpose. Indeed, at least one risk of loss letter candidly acknowledged, on its face, that the arrangement was made merely for the customer's "convenience." Pahapill reviewed and approved many of these transactions.

49. Dunn, Beatty and Pahapill knew, or were reckless in not knowing, that Nortel's risk of loss letters did not comply with US GAAP requirements and, thus, that such transactions were not permitted to be recognized as revenue prior to delivery. They knew, or were reckless in not knowing, that the primary reason for reintroducing bill and hold transactions at Nortel was to accelerate revenues on existing and new transactions to enable Nortel to meet its revenue forecasts.

50. Beatty and Pahapill also knew, or were reckless in not knowing, that Nortel structured the risk of loss letters in a manner intended to conceal the true nature of the transactions and to deceive Nortel's outside auditors, who would be the only persons outside of the transacting parties to see these letters. Specifically, though Beatty and Pahapill knew that bill and hold transactions must be initiated by the customer, their revenue recognition guidance charts provided a sample risk of loss letter to be used by Nortel's sales force and instructed its employees merely that the transactions must be evidenced on customer letterhead. Beatty and Pahapill were aware that the customer letterhead requirement was merely a fiction designed to provide audit evidence to mislead Nortel's outside auditors into believing that the risk of loss letters had been customer-initiated.

51. In late November 2000, Nortel compliance personnel – i.e., employees responsible for analyzing and providing guidance on accounting questions – learned of the manner in which

risk of loss letters were being obtained.  They raised concerns with Beatty and Pahapill that such transactions may not comply with US GAAP.  Beatty convened a conference call on December 8, 2000, to respond.  On this call, Beatty told the compliance personnel that it did not matter who initiated a bill and hold transaction as long as it was written on customer letterhead.  He then directed Nortel's compliance personnel to stop mentioning the customer-initiation requirement to Nortel's salespeople and customer account managers.

52.     In sum, Beatty and Pahapill – with Dunn's knowledge and acquiescence or recklessness – directed a campaign to accelerate revenues into 2000 through bill and hold transactions, despite knowing that such transactions did not satisfy US GAAP requirements.

53.     As part of its Second Restatement, Nortel reversed approximately $1 billion in revenues that had been recognized in the fourth quarter of 2000 through these improper bill and hold transactions.

### b.     Recognition Of Revenues On Sales To A Pass-Through Entity

54.     In addition to improperly recognizing revenues in the fourth quarter of 2000 through bill and hold transactions, Nortel also improperly recognized revenues upon delivery of millions of dollars of its goods to Telamon Corporation ("Telamon"), a pass-through entity for certain business deals.

55.     Nortel used Telamon, a minority-owned business, to satisfy the business requirements of certain Nortel customers.  Those customers were required to make a percentage of purchases from minority- or women-owned businesses; accordingly, rather than purchase Nortel's products directly from Nortel, they purchased Nortel's products from Telamon.

56.     Nortel recognized revenue when it delivered goods to Telamon.  Telamon, however, did not accept the risks of ownership of the Nortel products.  It could not (and did not) pay for

the products until such products had been resold and Telamon had received payment from the end customer.  Telamon also routinely returned unsold products to Nortel.  Indeed, in 2000, Telamon returned hundreds of millions of dollars of goods to Nortel that it was unable to resell due to softening orders for Nortel's products.

57.     Beatty knew, or was reckless in not knowing, that Telamon served merely as a pass-through entity, yet, he allowed Nortel to recognize revenues throughout 2000 upon delivery of Nortel's products to Telamon.  This violated US GAAP which provides, generally, that revenue from sales to intermediate parties for resale should be recognized only when the risks and rewards of ownership have passed.  When, as here, the reseller is acting, in substance, as an agent, the sale is treated as a consignment sale and revenue should not be recorded until the reseller has made delivery of the product to the end user.

58.     In the fourth quarter of 2000, Beatty considered changing Nortel's practice to recognize revenues on Telamon sales only when the end customer had paid for the goods.  However, in November 2000, he decided not to change the policy.  Beatty and Pahapill likewise discussed correcting the policy during the 2000 year-end closing process and again decided against it.  The decision, both times, was influenced by the fact that changing the practice would negatively impact Nortel's revenues for its optical business unit.

59.     Nortel improperly recognized approximately $150 million in revenues for sales to Telamon in the fourth quarter of 2000.  These revenues were ultimately reversed by Nortel's Second Restatement and, starting in 2001, Nortel began to recognize revenues on Telamon sales when the risk of ownership had passed to the end customer.

*c.* *The Partial Reversal of Revenues In Response*
*To The Success Of Bill And Hold Transactions*

60.     The bill and hold transactions alleged in Paragraphs 41 to 53, and the Telamon

relationship alleged in Paragraphs 54 to 59, pulled in more revenues than were necessary for

Nortel to meet its publicly-announced revenue guidance (including optical revenue guidance) for

2000.  It became apparent no later than the first week of January 2001 that Nortel would

recognize approximately $633 million more than it needed to reach its targets for fiscal year

2000.  Also, on January 5, 2001, Nortel's corporate financial planning group concluded that

"[e]arnings are there, but [r]evenue is too high."  Dunn, Beatty and Pahapill reacted by

selectively reversing certain low margin revenue items during the fiscal 2000 year-end closing

process in order to reduce revenues but not affect earnings for 2000.

61.     On January 5, 2001, Beatty directed Pahapill and several of Nortel's vice presidents

of finance to find low margin, non-optical revenue entries for reversal.  The point of the effort

not only was to bring Nortel's revenues in line with its guidance for 2000, but also, to preserve

Nortel's optical revenue and consolidated earnings result.  Nortel's finance managers responded

by carefully searching for low margin, non-optical items for reversal.  They submitted proposed

reversal entries to Pahapill for consideration.

62.     On January 7, 2001, Dunn, Beatty, Pahapill and others held a conference call to

discuss the proposed reversal entries in detail and to cull from the list those entries that would

reduce revenues but not significantly affect optical revenues or consolidated earnings.  They

reviewed each proposed entry, determined its impact on revenues, optical revenues and

consolidated earnings, and then selected specific entries to reverse or not, based upon their

impact.  Certain bill and hold transactions had been proposed for reversal, but, those transactions

impacted optical revenues, and thus other transactions were selected for reversal.  This process

enabled Dunn, Beatty and Pahapill to precisely engineer Nortel's fourth quarter 2000 results such that Nortel met but did not exceed public forecasts.

63.     Beatty and Pahapill acted to conceal Nortel's activities from Deloitte.  On January 8, 2001, a Nortel employee who worked closely with Pahapill and was involved in the reversal effort sent a "confidential" email to other participants in which he wrote, "we need to ensure that we have a crisp story on why we reversed these entries for the auditors that will be in today."  On or about the same day, and in anticipation that Deloitte would notice and question the reversals, Beatty misleadingly told a Deloitte partner that Nortel had reversed certain revenue entries as part of a normal-course review conducted during its year-end closing process.  Beatty said the reversals resulted from a complete scrub of revenue entries.  In their discussions with Deloitte, neither Beatty nor Pahapill explained the criteria under which revenue entries had been reversed, or the true reason for their reversal.

64.     Further, on or about February 1, 2001, in connection with Deloitte's annual audit of Nortel for 2000, Dunn provided Deloitte with a management representation letter – printed on Beatty's letterhead – which falsely represented, among other things:

> (a)     The consolidated financial statements for the period ending December 30, 2000, are presented in conformity with US GAAP;
>
> (b)     The unaudited interim financial information accompanying Nortel's financial statements has been prepared and presented in conformity with US GAAP and Commission guidance applicable to interim financial information;
>
> (c)     There have been no irregularities involving management or employees who have significant roles in the system of internal control or other employees or that could have a material effect on the financial statements;
>
> (d)     There are no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency; and
>
> (e)     There are no significant transactions that have not been properly recorded in the accounting records underlying the financial statements.

#### d.      *Nortel's Materially False And Misleading*
#### <u>*Fourth Quarter 2000 Earnings Release and 2000 Form 10-K*</u>

65.     Beatty (as Controller) and Pahapill (as Assistant Controller) were responsible for preparing Nortel's consolidated financial statements for the fourth quarter and year-end 2000. Pahapill, in her role as Vice President of Corporate Reporting, was also responsible for compiling and preparing disclosures for the 2000 Form 10-K.  Dunn (as CFO) participated in the preparation of the fourth quarter and year-end 2000 financial statements and reviewed and approved the financial statements prior to their public release.  Dunn also signed the 2000 Form 10-K.

66.     On January 18, 2001, in an earnings release which Dunn reviewed and approved, Nortel made public its financial results for the fourth quarter of 2000 ("Fourth Quarter 2000 Earnings Release").  The release reported revenues of $8.82 billion for the fourth quarter (a 34 percent increase from the corresponding quarter in 1999) and revenues of $30.28 billion for the year (a 42 percent increase from 1999).  The release stated that "the fourth quarter capped a year of exceptional growth, which was in line with … expectations."  It touted, among other things, Nortel's optical revenues, which "topped $10 billion for the year, more than doubling 1999 revenues" and attributed its optical revenues to "strong growth" in the United States and other geographic regions.  Dunn confirmed Nortel's financial guidance for 2001, saying that Nortel expects revenue and earnings to grow by 30 percent in 2001, a lower growth rate than in prior years.

67.     Dunn, Beatty and Pahapill knew, or were reckless in not knowing, that the Fourth Quarter 2000 Earnings Release misrepresented and/or omitted at least the following facts, disclosure of which was necessary to make the statements made not misleading:

(a)     The accounting changes implemented by Dunn, Beatty and Pahapill in the

fourth quarter of 2000 caused Nortel to materially overstate revenues and

understate net losses for the fourth quarter and fiscal year 2000.  Specifically,

Dunn, Beatty and Pahapill had implemented accounting changes which

violated US GAAP and resulted in the premature recognition of over $1

billion of revenues in the fourth quarter of 2000.  Such accounting

adjustments had a particularly positive impact on Nortel's optical revenues for

2000.  Absent these manipulations, Nortel could not have met its revenue

(much less its optical revenue) guidance for the fourth quarter and fiscal year

2000.

(b)     Dunn's statement about the expected growth rate of 2001 revenue and

earnings was materially false and misleading because, as Dunn knew, or was

reckless in not knowing, one of the reasons why revenues were expected to

grow more slowly in 2001 was that Nortel's improper acceleration of

revenues in 2000, through bill and hold transactions and consignment sales,

had cannibalized 2001's revenues.

68.     Dunn, and others, carefully crafted the timing of Nortel's Fourth Quarter 2000

Earnings Release to mislead investors about Nortel's performance just long enough for Nortel to

complete a $2.5 billion acquisition in February 2001.  Specifically, on February 13, 2001, with

the benefit of an artificially-inflated share price, Nortel paid $2.5 billion to acquire 980 NPLC,

JDS Uniphase's Zurich, Switzerland-based subsidiary and related assets in New York.  Nortel

issued 65.7 million shares of common stock as consideration for the purchase.  The price of those

shares was artificially inflated because it was based on Nortel's fraudulent fourth quarter 2000

results (announced on January 18, 2001), and because Nortel predicted strong growth in 2001,

despite knowing that its business was softening and that it had drawn revenues out of 2001 in order to meet its fourth quarter 2000 forecasts.

69.     On March 31, 2001, Nortel filed with the Commission its annual report on Form 10-K for the period ending December 31, 2000 ("2000 Form 10-K").  The 2000 Form 10-K reported revenues of $8.818 billion for the fourth quarter of 2000 and $30.275 billion for the year and represented that the financial statements therein were prepared in conformity with US GAAP.

70.     Dunn, Beatty and Pahapill knew, or were reckless in not knowing, that the 2000 Form 10-K misrepresented and/or omitted at least the following material facts, disclosure of which was necessary to make the statements made not misleading:

      a.      The 2000 Form 10-K falsely represented, in Note 2 to the financial statements and Item 7 (Management's Discussion and Analysis of Financial Condition and Results of Operation), that Nortel's consolidated financial statements for 2000 had been prepared in accordance with US GAAP.  This statement was materially false and misleading because, contrary to the requirements of US GAAP, Nortel, through the actions of Dunn, Beatty and Pahapill, had prematurely recognized revenue on bill and hold transactions that did not satisfy US GAAP.  Nortel's revenues for 2000 would have been at least $1 billion lower and its net loss materially higher if revenues on the improperly-structured bill and hold transactions had been recognized, in accordance with US GAAP, at the time of delivery.  Further, in contravention of US GAAP, Nortel, through the actions of Dunn, Beatty and Pahapill, had prematurely recognized revenue on consignment sales when its product was delivered to the consignee, Telamon.  Revenues on consignment sales to Telamon should have been recognized only after the end-customer had paid for the goods; had

revenues been recognized in accordance with US GAAP, Nortel's revenues for 2000 would have been lower by an additional $150 million.

b.     The 2000 Form 10-K also falsely represented, in Note 2 to the financial statements, that Nortel had adopted the recommendations of the Commission's "Staff Accounting Bulletin: No. 101 – Revenue Recognition in Financial Statements" ("SAB 101") effective January 1, 2000 and that "[t]he application of SAB 101 did not have a material adverse effect on the business, results of operations or financial condition of [Nortel]."   SAB 101 sets forth certain criteria that must be met in order for a company to recognize revenue on bill and hold transactions prior to delivery.   This statement was materially false and misleading because Nortel, through the actions of Dunn, Beatty and Pahapill, had rejected SAB 101 and had recognized revenues on bill and hold transactions that did not satisfy SAB 101, and other US GAAP cited within SAB 101.  Moreover, the revenue that it recognized pursuant to such improper bill and hold arrangements was material to an understanding of Nortel's business, results of operation and financial condition.  Nortel recognized more than $1 billion – later reversed in the Second Restatement – from improper bill and hold transactions entered into during the fourth quarter of 2000.  If Dunn, Beatty and Pahapill had adopted the recommendations of SAB 101, as it said, Nortel's revenues for 2000 would have been approximately $1 billion lower than reported and its revenues from optical equipment sales would have been particularly negatively affected.

c.     The 2000 Form 10-K omitted to disclose the material effect that Nortel's accounting changes, implemented by Dunn, Beatty and Pahapill in the fourth

quarter of 2000, had on Nortel's reported revenues for 2000.  Indeed, in Note 2 to its financial statements, Nortel purported to describe how its revenues are recognized but, in so doing, it failed to describe (i) that it had entered into bill and hold transactions (albeit ones that violated US GAAP) and (ii) it was recognizing revenues on such transactions in a manner not disclosed in Note 2, which caused Nortel to materially overstate its revenues and understate its net loss for the fourth quarter of 2000 and the fiscal year 2000.

d.      The 2000 Form 10-K, in comparing Nortel's 2000 results against its 1999 results, attributed Nortel's revenue growth to "[t]he considerable increase in sales of optical networking systems" in 2000, which it said was "driven by substantial growth across all regions…."  This statement omitted to disclose that a material part of the growth in Nortel's 2000 optical revenues (over $1 billion) was attributable not to natural growth, but rather, to Nortel's improper use of bill and hold transactions, as part of the accounting scheme Dunn, Beatty and Pahapill orchestrated during 2000.

e.      Dunn also knew that he had provided Nortel's outside auditors with a materially false and misleading management representation letter in connection with their audit of Nortel's financial statements.

71.    The revenue figures that were misstated in the 2000 Form 10-K affected future public filings which incorporated those figures by reference, including, but not limited to:  (i) Nortel's Forms 10-Q for the periods ended March 31, 2001, June 30, 2001 and September 30, 2001 (respectively, "First Quarter 2001 Form 10-Q," "Second Quarter 2001 Form 10-Q" and "Third Quarter 2001 Form 10-Q"), (ii) Nortel's Form 10-K for the period ended December 31, 2001 ("2001 Form 10-K"), (iii) Nortel's Forms 10-Q for the periods ended March 31, 2002 and June

30, 2002 (respectively, "First Quarter 2002 Form 10-Q" and "Second Quarter 2002 Form 10-Q"), (iv) Nortel's Form 10-K for the period ended December 31, 2002 ("2002 Form 10-K"), (v) Nortel's Form 10-K/A for the period ended December 31, 2002 ("Amended 2002 Form 10-K"), (vi) Nortel's Forms 10-Q/A for the periods ended March 31, 2003 and June 30, 2003 (respectively, "Amended First Quarter 2003 Form 10-Q" and "Amended Second Quarter 2003 Form 10-Q"), (vii) Nortel's Form 10-Q for the period ended September 30, 2003 ("Third Quarter 2003 Form 10-Q") and (vii) all of Nortel's Forms S-3, S-4 and S-8 filed with the Commission from March 23, 2001 through August 5, 2003.

### B. The Second Scheme:  Earnings Management Fraud

72.     Nortel suffered serious losses in 2001 due to a widespread economic downturn that impacted the entire telecommunications industry.  It responded by implementing a company-wide restructuring plan, which included dismissing two-thirds of its workforce (approximately 60,000 employees), real estate closures and dispositions, write-downs of capital assets, goodwill and other intangible assets, and contract settlements with customers and suppliers.  Dunn became CEO in October 2001, and, in January 2002, for the first time since it began its restructuring, Nortel again began to issue forward-looking earnings guidance to Wall Street.

73.     During the summer of 2002, as Nortel began to emerge from its downturn, Dunn told the investment community that he expected to return Nortel to profitability by the second quarter of 2003.  The Company established a "return to profitability" ("RTP") bonus program to spur Nortel's employees toward that goal.  Analysts, however, questioned whether a smaller Nortel (now a third of its former size) could satisfy its still massive, lingering liabilities.

74.     Nortel recognized the difficulty of returning to profitability within the timeframe promised by Dunn.  No later than the fourth quarter of 2002, the search was begun for artificial ways to return Nortel to profitability by Dunn's publicly announced deadline.  Dunn, Beatty

(then CFO) and Gollogly (then Controller), as well as senior business unit and regional finance managers, responded by improperly establishing, maintaining and releasing reserves in a calculated effort to manage the Company's earnings and deceive investors into believing that Nortel had returned to profitability.  These earnings management efforts turned Nortel's unexpected fourth quarter 2002 *pro forma* profit to a reported loss, its first quarter 2003 loss to a reported profit, and largely erased its second quarter 2003 loss.

### 1.   The Establishment and Maintenance Of Excess Reserve Balances At Nortel

75.   It was long-standing practice across Nortel to establish reserves on a "worst-case" basis, which, at Nortel, meant at an amount equal to the maximum possible exposure.  This approach violated US GAAP and resulted in the creation of reserves in amounts that far exceeded the Company's reasonable expectations for future liabilities.

76.   US GAAP states that an anticipated liability can be accrued if it is "probable" – meaning that "[t]he future events are likely to occur" and "the amount of the loss can be reasonably estimated."  If the anticipated liability falls within a range, the accrual must be based on the best estimate.  Where no estimate within the range is better than any other, US GAAP requires the accrual to be set at the bottom of the range.  US GAAP does not permit for reserves to be established outside of these criteria.

77.   Dunn and other senior management ensured that reserves would be established on a worst-case basis by making it known that they would not tolerate unanticipated losses where reserves had not been set high enough.  Dunn routinely communicated to employees that he wanted to deal with liabilities once and not readdress them in the future.  His management style was gruff and he was known to lash out in anger at employees who did not establish sufficient

reserves.  Those actions helped to maintain a culture of conservatism which led to the establishment of unnecessary reserves.

78.     Unnecessary reserves had also long been established in Nortel's business units and regional operations.  Dunn, and others, encouraged Nortel's finance managers across the Company to establish excess reserves when their quarterly results exceeded forecasts.  When Gollogly became Nortel's Controller, in 2002, he told his successor in the Wireless business unit that he had left the unit's balance sheets padded with excess reserves.  As Gollogly later explained in an email to his subordinates in the Controller's office, "[Nortel's] general approach is to sand bag good news and close 'hard' to the forecast."  The purpose of this practice was to meet, but not exceed, targets.

79.     In addition to establishing excess reserves as part of the normal course of business, Nortel also "topped up" existing reserve accounts in 2001, when Nortel underwent a company-wide restructuring.  Specifically, in connection with the restructuring, Nortel established massive reserves for severance and fringe benefits costs, lease termination costs, and costs related to the disposal of assets, but, on top of that, it added arbitrary excess amounts for reasons having nothing to do with actual anticipated liabilities.

### a.     *Quantification Of Existing Excess Reserves*

80.     By the summer of 2002, investment analysts began to question the enormous size of Nortel's accrued liabilities.  In particular, analysts questioned why the accrued liabilities number remained so high throughout the restructuring given that, by this point, Nortel was about one-third of its former size.

81.     Beatty responded by directing Nortel's then Assistant Controller to quantify reserve balances company-wide and to ascertain the status of such balances.  Nortel's corporate

consolidation staff, over the next few months, found hundreds of millions of dollars in what they determined were excess reserves.

82.   In October 2002, Beatty and Gollogly were advised that Nortel was carrying on its balance sheet at least $303 million in excess reserves companywide.  Included among the reserve accounts identified to Beatty and Gollogly were the following corporate-level balances:

F. Dunn Discretionary Provision (a/k/a Degree of Difficulty Provision)
Intercompany Out of Balance
R&D Out of Balance
Short Close Exposure
EDSN Minority Interest
Montreal Consolidation
QST Provision
Siemens Settlement
Global Crossing
QWEST
General Provision

Some of these reserve accounts had loosely-identified purposes.  One account was simply labeled "General Provision," which the corporate control staff described as "left in place per Doug Beatty."  Another account labeled "F. Dunn Discretionary Provision" was described by Nortel's corporate control staff as "left in place per Frank Dunn."  Other accounts were maintained on justifications that shifted from period to period.

83.   Beatty and Gollogly informed Dunn, in early November 2002, of the size of Nortel's excess reserves.  Under US GAAP, because these reserves would have been material to Nortel's results at the time, these reserves should have been released immediately, disclosed publicly, and Nortel should have restated its financial results to reflect the proper periods into which the reserves should have been released.  Dunn, Beatty and Gollogly instead decided to conceal the nature of these reserves and to keep the excess amounts for future earnings management purposes as needed.

84.     Dunn and Beatty had groomed market expectations throughout 2002 by telling

investment analysts that their goal was to return Nortel to profitability by the second quarter of

2003.  On July 18, 2002, during Nortel's second quarter 2002 earnings call, Dunn stated "by

June of next year I expect to … turn profitable."  Beatty reiterated this guidance on October 17,

2002, during Nortel's third quarter 2002 earnings call, when he told analysts:

> We are continuing to target profitability by the second quarter of
> 2003…. This drive to profitability is based on the targeted
> breakeven model of the quarterly revenues of below $2.4 million.
> Having further worked with specific plans in recent weeks, we
> expect to support this business model with approximately 35,000
> people and expect to have most of the actions completed by the
> end of 2002.

Dunn and Beatty thereby conveyed the impression that Nortel's performance was stabilizing and

marching consistently toward profitability under their management.

85.     A proper release of Nortel's known excess reserves in November 2002 would have

dramatically increased Nortel's earnings for the fourth quarter of 2002 – and reduced its losses in

earlier periods – before the restructuring was complete.  Dunn and Beatty would not be credited

for Nortel's return to profitability.  The Company's internal control weaknesses, which had

permitted the establishment of excess reserves in the first place, would be exposed.

Additionally, at the time, Dunn and Beatty were concerned that Nortel might show a loss in the

first quarter of 2003, and, thus, any fourth quarter 2002 profit would be seen as an aberration that

did not reflect a stable return to profitability.

### b.      *Creation of Additional Excess Reserves*

86.     Despite the decision not to release known and quantified excess reserves, it became

clear in December 2002 that Nortel would nonetheless show a *pro forma* profit for the fourth

quarter of 2002.  Nortel, at the time, reported *pro forma* figures alongside its US GAAP results

and therefore its *pro forma* profit for the fourth quarter of 2002 would have been reported

publicly. This was unexpected by everyone. The public expected a return to profitability in the second quarter of 2003. Dunn and Beatty told Nortel's Board of Directors in December 2002 that they anticipated a loss of approximately $65 million for the fourth quarter of 2002.

87.    Moreover, a *pro forma* profit would have triggered payouts under Nortel's "return to profitability" ("RTP") bonus program. Dunn believed investors would not react favorably to a payment of millions of dollars of bonuses at the end of a year in which the Company lost over $3 billion from its continuing operations.

88.    Dunn and Beatty reacted to this unexpected news of a fourth quarter 2002 *pro forma* profit by ordering the establishment of additional excess reserves to ensure that Nortel posted a loss for the fourth quarter of 2002, in line with the public's expectations and the expectations of Nortel's Board of Directors.

89.    Gollogly spearheaded the effort. He instructed Nortel's director of corporate financial planning to contact the vice presidents of finance of Nortel's business units, and certain regional finance and control managers, and direct them to accrue additional reserves. Gollogly and Beatty also contacted certain finance personnel directly to encourage them to find more reserves to establish for the quarter. Proposed reserve entries were submitted to Gollogly, who, between January 6 and 8, 2003, oversaw the booking of these additional reserves until he determined that Nortel's earnings would be reduced to within a few million dollars of the $65 million loss that Dunn and Beatty had internally predicted and shared with Nortel's Board of Directors. Gollogly also succeeded in pressuring Nortel's U.S. Regional Controller to reduce the planned release of a fringe benefit reserve by $11 million. On January 8, 2003, Beatty reported to Dunn the results of his and Gollogly's efforts.

90.    Through their eleventh-hour efforts, Dunn, Beatty and Gollogly established an additional $176 million in excess reserves, thereby creating a loss for the fourth quarter of 2002,

consistent with the public's (and Nortel's Board's) expectations, and thereby avoiding showing a *pro forma* profit sooner than the Company had forecast in its public guidance.

91.     Gollogly (as Controller) was responsible for preparing Nortel's consolidated financial statements for the fourth quarter of 2002.  Beatty (as CFO) participated in the preparation of such financial statements.  Beatty and Dunn reviewed and approved the financial statements prior to their public release.

92.     On January 24, 2003, in an earnings release which Dunn and Beatty reviewed and approved, Nortel made public its financial results for the fourth quarter of 2002 ("Fourth Quarter 2002 Earnings Release").  The release reported a *pro forma* loss for the quarter of $62 million (or $0.01 per share) and US GAAP loss for the quarter of $248 million (or $0.06 per share).  Dunn announced that the Company was "just short of *pro forma* profitability in the quarter" and has now stabilized its business model.  He promised that "[a]s [Nortel] enter[s] 2003, the focus on profitability will continue."

93.     In order to obtain this precise result, Beatty and Gollogly, with Dunn's knowledge and acquiescence or recklessness, carried out yet another last-minute manipulation of Nortel's fourth quarter 2002 earnings.  On or about January 22, 2003 – the day before Nortel announced its carefully engineered fourth quarter 2002 results – Nortel decided it needed to change its accounting for its acquisition of the JDS Uniphase subsidiary, 980 NPLC.  This accounting change had the unexpected effect of reducing Nortel's earnings and thus increased its fourth quarter 2002 loss by approximately $25 million.  To counter the impact of the $25 million charge, and ensure that losses were in-line with (and not greater than) expectations, Beatty and Gollogly caused $25 million of excess reserves that Gollogly had established in early January 2003, to be reversed.  Nortel had planned to establish $176 million in excess reserves, but,

instead established $151 million. The reason for this reversal was to keep the previously-engineered numbers for the quarter the same.

94.    Dunn, Beatty and Gollogly knew, or were reckless in not knowing, that Nortel's Fourth Quarter 2002 Earnings Release misrepresented and/or omitted at least the following material facts, disclosure of which was necessary to make the statements made not misleading:

>    (a)    The establishment of additional excess reserves by Dunn, Beatty and Gollogly in the fourth quarter of 2002 caused Nortel to materially overstate Nortel's *pro forma* net losses for the quarter and materially overstated its US GAAP losses for the quarter and year. Absent the establishment of an additional $151 million of reserves Nortel would have reported a *pro forma* profit (instead of a $62 million *pro forma* loss) for the quarter and its US GAAP loss would have been reduced by more than half.

>    (b)    Moreover, the release of prior-established excess reserves – the existence of which the Fourth Quarter 2002 Earnings Release concealed – would have pushed Nortel even further into profitability on both a *pro forma* and US GAAP basis. Nowhere did the Fourth Quarter Earnings Release reveal that Dunn, Beatty and Gollogly had identified at least $303 million of excess reserves on the Company's books or that they had created an additional $151 million in excess reserves in order to ensure Nortel's fourth quarter 2002 results were in line with public expectations and the expectations of Nortel's Board of Directors.

>    (c)    Further, Dunn knew or was reckless in not knowing that the Company's true results – as opposed to the results achieved through Dunn, Beatty and

Gollogly's accounting manipulation – were not "just short of *pro forma* profitability."

(d)    Also, though it may be true that Dunn expected his "focus on profitability" to continue, such a statement was, at best, grossly misleading because Dunn expected to release excess reserves in future quarters in order to achieve profitability by his publicly-disclosed timeline.

### 2.    *Releases of Excess Reserves to Fabricate Profits*

95.    The change that Nortel made in January 2003 to its accounting for the acquisition of the JDS Uniphase subsidiary, 980 NPLC, not only impacted Nortel's results for the fourth quarter of 2002, but also, caused Nortel internally to revise downward its earnings forecasts for 2003.  Specifically, Nortel's previously forecasted *pro forma* profit (of $220 million) for 2003, became a forecasted *pro forma* loss (of $44 million) for 2003.  The accounting change threatened Nortel's ability to return to profitability by the second quarter of 2003.  It also threatened Nortel's ability to pay RTP bonuses in 2003.

96.    Dunn, Beatty and Gollogly refused to accept this turn of events.  Instead they decided to best their own projections and to fabricate profits a quarter earlier than expected, by releasing excess reserves company-wide.

97.    Despite this plan, and despite their understanding that Nortel was likely to produce a loss for the year, Dunn and Beatty continued to tell the public that they expected Nortel to achieve *pro forma* profitability by the end of June 2003.  In the Fourth Quarter 2002 Earnings Release, Beatty specifically reaffirmed Nortel's earlier guidance that Nortel expects to achieve *pro forma* profitability by the second quarter of 2003.

### a.      First Quarter 2003

98.      Dunn and Beatty reacted to the downward-revised internal forecast for the first quarter of 2003 by setting new (and higher) earnings targets for Nortel for the first quarter of 2003 and by instructing Nortel's corporate financial planning group to devise "roadmaps" for each of the business units to assist Nortel in reaching the new targets.  The goal articulated by Dunn at the time was to achieve actual US GAAP profitability in the first quarter of 2003 and to pay RTP bonuses.

99.      Dunn regarded RTP bonuses – payment of which was triggered by *pro forma* profitability – as necessary to hold together his management team.  He believed, however, that paying RTP bonuses based on *pro forma* profits would anger investors if Nortel did not also turn a true profit under US GAAP and thus he placed great importance on reaching an "all-in GAAP profit" in the first quarter of 2003 too.

100.      The corporate financial planning group created and distributed roadmaps to Dunn, Beatty and Gollogly, which reflected (i) how much each business unit was expected to contribute to Nortel's newly-established earnings target and (ii) how much would be released from Nortel's corporate-level reserve accounts.

101.      On February 19, 2003, Beatty and Gollogly conveyed the earnings targets to Nortel's business unit vice presidents of finance and regional finance managers and told them that Dunn wanted the Company to generate a profit for the first quarter of 2003.

102.      While Dunn, Beatty and Gollogly were scheming to return Nortel to profitability, its actual results were worsening.  On or about March 22, 2003, internal forecasts that were provided to Beatty and Gollogly, and later conveyed to Dunn, stated that revenues were "softening versus [business unit] budgets" and that "Q1 and Q2 results [were] dependent on non-operating clean ups."  The worsening of results required Nortel's corporate financial planners

repeatedly to increase the planned release of corporate excess reserves to meet the first quarter

profitability target.

103.     The profit targets set by Dunn, Beatty and Gollogly for the first quarter of 2003 were

ultimately met, in part, through Nortel's release of $361 million in reserves (i.e. non-operating

clean ups).  At least $274 million of those reserves were excess reserves specifically released at

the direction of Dunn, Beatty and Gollogly to meet earnings and bonus targets for the first

quarter of 2003.  Dunn, Beatty and Gollogly continued to hold onto other known excess reserves

for future use as needed.

104.     Gollogly was responsible for preparing Nortel's consolidated financial statements for

the first quarter of 2003.  Beatty participated in the preparation of such financial statements and

he and Dunn reviewed and approved the financial statements prior to their public release.

Additionally, Dunn and Beatty certified the statements as required by Section 302 of the

Sarbanes-Oxley Act of 2002.

105.     On April 24, 2003, in an earnings release which Dunn and Beatty reviewed and

approved, Nortel made public its financial results for the first quarter of 2003 ("First Quarter

2003 Earnings Release").  The release reported that Nortel had achieved US GAAP net earnings

of $54 million (or $0.01 earnings per share) for the first quarter of 2003.  Dunn touted his

success, stating that he was "extremely pleased to have achieved profitability in the first quarter

of 2003 and reached [his publicly stated] goal one quarter early."  Rather than disclose the real

reason for Nortel having achieved profitability in the first quarter of 2003, Dunn instead

attributed Nortel's profitability to a strong business model:

> Before I talk about the market, our product position, some of the
> events that have taken place, let me make a few comments on the
> results of the first quarter.  I'm delighted with the results.  We're
> profitable for the first time in three years, over three years, and we
> met our profitability objective one quarter early.  We had very

> strong margin performance and we continue to focus on driving a
> business model that continues to accelerate our margin as an
> overall objective in this business.  We had positive results in our
> cash.  Our cash from operations before restructuring costs
> generated cash.  And again, that's a very important milestone for
> us and we're very focused on that aspect.

106.    Nortel's quarterly report on Form 10-Q for the period ending March 31, 2003 ("First

Quarter 2003 Form 10-Q"), signed by Beatty and Gollogly and certified by Dunn and Beatty,

contained similarly misleading financial statements and disclosures.  Specifically, in Note 3 to

the financial statements ("Consolidated Financial Statement Details – Other") and Item 2

("Management's Discussion and Analysis of Financial Condition and Results of Operation"),

Nortel stated that:

> [d]uring the three months ended March 31, 2003, Nortel Networks
> net earnings (loss) included approximately $80 [million] of
> favorable impacts … associated with reductions in accruals
> principally related to the wind-down of integration activities of
> previously acquired companies, operations originally structured as
> joint ventures and miscellaneous tax matters.

The Company improperly suggested that it had determined, that quarter, that $80 million of

reserves were no longer necessary and could appropriately be released in the first quarter of

2003:

> During the three months ended March 31, 2003, we reviewed the
> matters related to the wind-down and settlement of balances
> associated with the integration activities of previously acquired
> companies and operations originally structured as joint ventures
> and determined that based on decreases in transactional activity
> and magnitude of their net position that it was appropriate to
> reduce certain accruals….   These balances were considered to be
> in dispute, erroneous and/or for amounts which could not be
> resolved.

107.    Dunn, Beatty and Gollogly's inappropriate reserve releases caused Nortel to report in

its First Quarter 2003 Earnings Release and its First Quarter 2003 Form 10-Q materially

overstated net earnings for the quarter.  Nortel's Second Restatement revealed that Nortel should have recorded at least a $124 million loss for the first quarter of 2003.

108.    Dunn, Beatty and Gollogly knew, or were reckless in not knowing, that Nortel's First Quarter 2003 Earnings Release and First Quarter 2003 Form 10-Q misrepresented and/or omitted at least the following material facts, disclosure of which was necessary to make the statements made not misleading:

> (a)    Nortel's profit for the quarter had actually been reverse engineered by Dunn, Beatty and Gollogly through the improperly-timed release of at least $274 million of excess reserves.  The release of such reserves by Dunn, Beatty and Gollogly in the first quarter of 2003 were specifically timed to meet earnings and bonus targets.
>
> (b)    Absent such improperly-timed releases, Nortel would have reported substantial losses for the first quarter of 2003.  Indeed, Nortel's Second Restatement found that Nortel should have reported at least a $124 million loss for the quarter, a material difference compared to what Nortel actually reported for the quarter.  Specifically, absent the release of $274 million in excess out-of-period reserves, Nortel would have reported at the time an approximate $220 million loss (or $0.05 US GAAP loss per share) instead of a $54 million profit (or $0.01 US GAAP earnings per share) for the quarter.
>
> (c)    Nortel's margins improved because of the release of excess reserves.
>
> (d)    Though Nortel acknowledged the release of $80 million in reserves – and a resulting favorable impact on Nortel's earnings for the quarter – those reserves were released out-of-period and were part of a much larger pool of

previously-identified excess reserves that had also been released improperly in the first quarter of 2003.

109.    In addition to the foregoing, on or about May 9, 2003, in connection with Deloitte's review of Nortel's first quarter 2003 results, Dunn, Beatty and Gollogly provided Deloitte with a management representation letter – printed on Gollogly's letterhead – which falsely represented, among other things:

(a)    The interim consolidated financial statements for the period ending March 31, 2003, are presented in conformity with US GAAP;

(b)    They have no knowledge of any fraud or suspected fraud affecting the Company involving: management, employees who have significant roles in internal control, or others, where fraud could have a material effect on the interim financial information;

(c)    During the three months ended March 31, 2003, the Company recorded $80 million of reductions in certain accruals as described in the notes to the consolidated interim financial statements.  The Company has reviewed the amount of the reductions, the remaining related accrual balances, and the related disclosures and determined that they are appropriate; and

(d)    There are no significant deficiencies, including material weaknesses, in the design or operations of internal controls that could adversely affect the Company's ability to record, process, summarize and report interim financial data.

### b.    Second Quarter 2003

110.    In the second quarter of 2003, as in the first, Dunn and Beatty ordered the corporate financial planning staff to create scenarios for achieving a US GAAP profit for the quarter.  The resulting plan, crafted in several iterations throughout the quarter, included the release of approximately $514 million in reserves, approximately $358 million of which were specifically timed to meet earnings and bonus targets.  The plan, if fully executed, was expected to result in a *pro forma* profit of $186 million and a US GAAP profit of $131 million for the second quarter of 2003.  However, in July 2003, before all of the releases could be made, Deloitte told Nortel that it needed to maintain $142 million of the planned releases until they could be documented and

justified.  Nortel's plan thus was thwarted and Nortel instead reported a US GAAP loss for the quarter though it showed a *pro forma* profit necessary to pay RTP bonuses that quarter.

111.    Specifically, in March 2003, based on communications with Gollogly's staff, Deloitte had learned that Nortel released at least $80 million in excess reserves in the first quarter of 2003.  Deloitte asked Nortel for backup documentation supporting the timing of those releases. It became apparent, over the course of a few months, that Nortel could not produce sufficient backup documentation and also that Nortel planned additional releases in the second quarter of 2003 from the same group of reserve accounts.  Deloitte became concerned about Nortel's reserve practices and the quality of its earnings.

112.    US GAAP requires reserves to be released in the quarter in which they are no longer needed.  If the excess amount is not released on a timely basis – i.e., if it is not released when the liability for which it was created has been resolved and an excess determination has been made – the company must disclose the effect of the release on the current period (if it is material) and the company must also disclose what the effect would have been if the reserve had been timely released, and it may be required to restate previous financial statements.

113.    Nortel could not produce documentation to Deloitte demonstrating into which periods the $80 million in excess reserves should appropriately have been released.  Deloitte recommended that Nortel not release any further reserves for which it did not have appropriate documentation and support.

114.    Certain reserves had already been released during the second quarter of 2003, so, Gollogly responded to Deloitte's recommendation by tasking certain subordinates to determine which of the remaining planned reserve releases for the second quarter of 2003 were out-of-period.  By the end of June 2003, his subordinates reported that $142 million of additionally planned releases for the second quarter of 2003 were out-of-period.  Gollogly disclosed these

reserves to Deloitte and said he wanted to release them in the second quarter of 2003.  However, he did not provide Deloitte with any documentation that would allow Deloitte to determine when the reserves should appropriately have been released.  On or about July 7, 2003, when Nortel was in the midst of its second quarter closing process, Deloitte asked Gollogly to keep the $142 million on Nortel's books until appropriate support could be gathered to justify their release because the release of these reserves would have materially affected Nortel's results by turning its second quarter loss into a profit.

115.     Nortel's plan for achieving second quarter US GAAP profitability was thus thwarted. Nortel had released approximately $372 million of reserves (approximately $216 million of which were excess reserves released specifically to meet earnings and bonus targets) in the second quarter of 2003, but, it was unable to release the additional $142 million in excess reserves needed to achieve US GAAP profitability.

116.     Gollogly was responsible for preparing Nortel's consolidated financial statements for the second quarter of 2003.  Beatty participated in the preparation of such financial statements and he and Dunn reviewed and approved the financial statements prior to their public release. Additionally, Dunn and Beatty certified the statements as required by Section 302 of the Sarbanes-Oxley Act of 2002.

117.     On July 24, 2003, in an earnings release which Dunn and Beatty reviewed and approved, Nortel made public its financial results for the second quarter of 2003 ("Second Quarter 2003 Earnings Release").  The release reported a US GAAP net loss for the second quarter of $14 million (or $0.00 earnings per share).

118.     Nortel's quarterly report on Form 10-Q for the period ending June 30, 2003 ("First Quarter 2003 Form 10-Q"), signed by Beatty and Gollogly and certified by Dunn and Beatty, contained similarly misleading financial statements and disclosures.  Specifically, in Note 3 to

the financial statements ("Consolidated Financial Statement Details – Other") and Item 2

("Management's Discussion and Analysis of Financial Condition and Results of Operation"),

Nortel made no mention of the release of at least $216 million in excess and out-of-period

reserves, but rather, merely reiterated its prior incomplete disclosure about its first quarter release

of the $80 million in reserves.  It stated:

> [d]uring the three months ended March 31, 2003 and six months
> ended June 30, 2003, Nortel Networks net earnings (loss) included
> approximately $80 [million] of favorable impacts … associated
> with reductions in accruals principally related to the wind-down of
> integration activities of previously acquired companies, operations
> originally structured as joint ventures and miscellaneous tax
> matters.

119.     Dunn, Beatty and Gollogly's improperly-timed release of $216 million in excess

reserves caused Nortel to report in its Second Quarter 2003 Earnings Release and its Second

Quarter 2003 Form 10-Q materially overstated earnings per share for the quarter.  Specifically,

absent the release of at least $216 million in excess out-of-period reserves, Nortel would have

reported an approximate $0.05 US GAAP loss per share, instead of $0.00 earnings per share.

120.     Dunn, Beatty and Gollogly knew, or were reckless in not knowing, that Nortel's

Second Quarter 2003 Earnings Release and Second Quarter 2003 Form 10-Q misrepresented

and/or omitted at least the following material facts, disclosure of which was necessary to make

the statements made not misleading:

> (a)     Nortel's second quarter results had actually been reverse engineered by Dunn,
>
> Beatty and Gollogly through the improperly-timed release of at least $216
>
> million of excess reserves.  The release of those reserves had been specifically
>
> timed to meet earnings and bonus targets for the quarter.
>
> (b)     Absent the improperly-timed release of at least $216 million in excess out-of-
>
> period reserves, Nortel would have reported substantial losses for the first

quarter of 2003.  Indeed, Nortel's Second Restatement found that Nortel
should have reported at least a $101 million loss, a material difference
compared to the $14 million loss that Nortel actually reported for the quarter.
Nortel's reported financials for the quarter were materially affected by the
release of those reserves.  Specifically, absent the release of at least $216
million in excess out-of-period reserves, Nortel would have reported at the
time an approximate $230 million loss (or $0.05 US GAAP loss per share)
instead of a $14 million loss (or $0.00 US GAAP loss per share) for the
quarter.

    (c)    Dunn, Beatty and Gollogly had planned to release an additional $142 million
of excess reserves during the second quarter of 2003, but the plan was
interrupted by Deloitte.

121.    In addition to the foregoing, on or about August 11, 2003, in connection with
Deloitte's review of Nortel's second quarter 2003 results, Dunn, Beatty and Gollogly provided
Deloitte with a management representation letter – printed on Gollogly's letterhead – which
falsely represented, among other things:

    (a)    The interim consolidated financial statements for the period ending June 30,
2003, are presented in conformity with US GAAP;

    (b)    They have no knowledge of any fraud or suspected fraud affecting the
Company involving: management, employees who have significant roles in
internal control, or others, where fraud could have a material effect on the
interim financial information;

    (c)    There are no significant deficiencies, including material weaknesses, in the
design or operations of internal controls that could adversely affect the
Company's ability to record, process, summarize and report interim financial
data.

122.    The earnings and loss figures that were misstated in the First and Second Quarter
2003 Forms 10-Q affected future public filings which incorporated those figures by reference,
including, but not limited to: (i) Nortel's Form 10-Q for the period ending June 30, 2003 ("Third
Quarter 2003 Form 10-Q") and (ii) all of Nortel's Forms S-3, S-4 and S-8 filed with the
Commission from June 30, 2003 through August 5, 2003.  The earnings and loss figures that
were misstated in the First and Second Quarter 2003 Forms 10-Q were restated on November 19,
2003 and December 23, 2003 as part of the First Restatement.

### 4.    *Payment of Undeserved Bonuses and Stock to Nortel's Managers*

123.    Defendants and other executives and employees received millions of dollars in
bonuses as a result of Dunn, Beatty and Gollogly's earnings scheme in 2002 and 2003.  The
scheme artificially created the *pro forma* profit levels necessary to trigger bonuses.

124.    Dunn and Beatty specifically took RTP bonus payments into account when deciding
the amount of excess reserves to release in the first and second quarters of 2003.  Specifically,
they ordered the Company's corporate financial planners to plan for the release of sufficient
reserves not only to generate a profit in those quarters, but also, to pay RTP bonuses.

125.    In 2003, approximately $92 million was paid in RTP bonuses.  Of that amount,
approximately $19 million went to Nortel's top 43 managers, including Dunn, Beatty and
Gollogly, and the remainder was spread out over a 30,000-person workforce.  Approximately
$10 million was paid in the second quarter of 2003 alone because, although Nortel had not
posted a US GAAP profit that quarter, it nonetheless had achieved a $34 million *pro forma*
profit, thereby triggering payment of RTP bonuses.  In 2003, Dunn received $3,643,161 in RTP
bonuses, while Beatty and Gollogly received $1,311,161 and $353,100, respectively.

126.    The reserve releases in the first and second quarters of 2003 also enabled Nortel to
artificially meet the criteria for issuing so-called "Restricted Stock Units" ("RSUs") to

management.  Nortel's top 43 managers received 6.26 million RSUs in July 2003, and 37 of

those managers collected an additional 5.6 million RSUs in January 2004.  Similar to their

pursuit of RTP bonuses, Dunn, Beatty and Nortel's corporate financial planners tracked and

tailored reserve releases to ensure the Company met RSU performance milestones.  Indeed,

Nortel's corporate financial planners continually analyzed the effect that planned reserve releases

would have on management's ability to receive RSUs.  Dunn received $2,906,954 in income

from RSU grants in 2003, while Beatty and Gollogly received $1,061,499 and $1,000,671,

respectively.

127.     These same releases also allowed Nortel's management to claim that they had met the

criteria for receiving so-called "SUCCESS" bonuses.  In January 2004, $8.2 million was

awarded to 24 of Nortel's top executives in the form of a SUCCESS bonus.  Dunn and Beatty

received no SUCCESS bonus because Nortel's Board halted their payments until the conclusion

of Wilmer Hale's investigation.  Gollogly, however, received $148,650.

### 5.     Fraudulent Statements Made about the Circumstances Behind the First Restatement

128.     Nortel's earnings management scheme began to unravel at the end of the second

quarter of 2003.  On the morning of July 24, 2003, the same day on which Nortel issued its

Second Quarter 2003 Earnings Release, Deloitte informed Nortel's Audit Committee that it had

found a "reportable condition" with respect to weaknesses in Nortel's accounting for the

establishment and disposition of reserves.

129.     Deloitte informed the Audit Committee that, in response to its concerns, Nortel's

management had undertaken a project "to gather support and determine proper resolution of

certain provision balances."  Management, in fact, had undertaken this project at Deloitte's

insistence because Deloitte required adequate audit evidence for their upcoming year-end 2003

audit.  Dunn and Beatty, who spearheaded the review of Nortel's balance sheet in the second half

of 2003, attended the Audit Committee meeting but did not reveal any of their past activities.

130.    Nortel concealed Deloitte's concerns from the public.  Nortel's Second Quarter 2003

Earnings Release contained no mention of Deloitte's concerns and merely stated that:

> Given in 2003 relatively minor amounts may have greater effect on
> reported results, the Company has initiated a comprehensive
> review and analysis of its assets and liabilities.  The outcome of the
> activity may result in the elimination of certain assets and
> liabilities but is not expected to have a negative impact to net
> assets.  No amounts relating to the elimination of any such assets
> and liabilities have been included in the results for the second
> quarter of 2003.

During the earnings call that same day ("Second Quarter 2003 Earnings Call"), Beatty explained

that Nortel was undertaking a "comprehensive review of assets and liabilities" because Nortel's

improved operating results had "introduced the company to a new environment, where relatively

minor amounts, both expense and income, have a much greater opportunity to [materially]

impact reported results each quarter."  He went on to say that "minor amounts included in results

prior to 2003 would not have been considered material, but those same amounts today could

have the effect of changing reported results in a quarter from a profit to a loss or vice versa."

131.    Dunn, Beatty and Gollogly knew, or were reckless in not knowing, that Nortel's

disclosures about its review of assets and liabilities in 2003 were materially false and misleading

because such disclosures failed to state that the review had been prompted by Deloitte's report to

the Audit Committee and that Deloitte had expressed concern about Nortel's creation and use of

reserves and the quality of its earnings.  Additionally, the disclosures omitted any mention of

Dunn, Beatty and Gollogly's fraudulent manipulation of reserve accounts to manage earnings.

132.    On August 12, 2003, in its Second Quarter 2003 Form 10-Q, Nortel disclosed for the

first time that Deloitte had raised a "reportable condition," but it omitted any mention of the

nature of the concern or that the Company had engaged in improper accounting practices with

respect to its reserves.  Instead, Nortel merely reiterated what it had told the public in the past:

> In light of a period of unprecedented industry adjustment and subsequent restructuring actions, including workforce reductions and asset write-downs, in the second quarter of 2003 Nortel Networks initiated a comprehensive review and analysis of identifiable categories of its assets and liabilities (the "comprehensive review"). The amounts under review were recorded when Nortel Networks balance sheet and income statement were much larger. Specifically, what would have been relatively minor amounts in prior periods may be considered to be material to current periods. The comprehensive review is in addition to reviews normally performed by Nortel Networks in connection with the recording of current period financial results.

Such disclosures created the materially false and misleading impression that the review

concerned activities pre-dating the restructuring, when "Nortel['s] … balance sheet and income

statement were much larger."  Dunn, Beatty and Gollogly knew such disclosures were materially

false and misleading because, the review, in fact, concerned activities that impacted the

Company's 2002 and 2003 financials, as well as financials from earlier periods.  No mention was

made of Deloitte's concern about the creation and use of reserves, except for a cryptic statement

that:

> In connection with the assessment of the liabilities (including accruals and provisions) identified above, Nortel Networks has noted certain deficiencies in documentary support. Nortel Networks continues to address this matter as part of the comprehensive review.

Such a disclosure failed to reveal the elaborate earnings management scheme that Dunn, Beatty,

Gollogly and others had engaged in.

133.    Just prior to the filing of Nortel's Second Quarter 2003 Form 10-Q, Gollogly

distributed a candid email to corporate employees assisting him in the First Restatement which

warned that Nortel's comprehensive review would put an end to the Company's historical

practice of using reserves to manage earnings.  On July 31, 2003, he wrote, "I think we need to reinforce the importance of forecasting.  It's [sic] seems like a throwaway comment, but if we "clean up" the balance sheet, the [business units'] ability to deliver earnings based partly on discretionary elements pretty much goes away."

134.    Dunn and Beatty nonetheless continued to trumpet Nortel's supposed return to profitability.  On October 23, 2003, during Nortel's third quarter 2003 earnings call, Dunn said "we will make not only [a] profit in the [third] quarter, but a profit on the full year, and that's the first time in six years."  Likewise, during Nortel's fourth quarter 2003 earnings call, Dunn said "our revenues came in at $9.8 billion and our earnings for the full year came in at $372 million, which is really the first profit we have had on a full-year basis.  The last time we made profits was six years ago."  Dunn, Beatty and Gollogly knew, or were reckless in not knowing, such statements were materially false and misleading because  Nortel's first and second quarter 2003 results – and thus its results for 2003 – had been artificially boosted by improper reserve releases.

135.    At the same time, Dunn and Beatty also misrepresented the reasons behind Nortel's need to restate its prior financial results.  On October 23, 2003, Nortel announced in a press release that it would need to make a financial restatement.  During Nortel's third quarter 2003 earnings call, also held on October 23, 2003, Dunn and Beatty misleadingly characterized the restatement as an effort to clean up honest control lapses in prior years.  Dunn innocuously explained that "following a period of dramatic restructuring" the Company found some "mistakes" in its accounting.  Beatty repeated that theme and also pointed out that Nortel decided to review its assets and liabilities because the "impact of materiality" had recently changed as Nortel's results were "picking around along break-even."  Dunn likewise stated in a press release issued the same day that "[t]he challenges that faced Nortel Networks and our industry over the

past few years were unprecedented … It is clear now that in such a volatile environment, errors were made." At no time did they give any indication that intentionally improper accounting was to blame.

136. On November 19, 2003, in its quarterly report on Form 10-Q for the period ending September 30, 2003 ("Third Quarter 2003 Form 10-Q"), Nortel filed its first periodic report containing restated figures, which offered the same explanations and likewise gave no indication that any misconduct led to the restatement. The Third Quarter 2003 Form 10-Q – a.k.a. the First Restatement – restated approximately $948 million in total liabilities (the "First Restatement"). Dunn, Beatty and Pahapill's revenue recognition scheme had not been part of the management-led review and, thus, the First Restatement did not restate any revenues that had been affected by the revenue recognition scheme. Moreover, due to the restricted nature of the review and its focus only on certain reserve issues, the First Restatement also did not restate for a significant number of the improper out-of-period releases made by Dunn, Beatty and Gollogly as part of the earnings management scheme.

137. Gollogly was responsible for preparing Nortel's consolidated financial statements for the third quarter of 2003 and the restated results reported in the First Restatement. Beatty participated in the preparation of such financial statements and he and Dunn reviewed and approved the financial statements prior to their public release. Additionally, Dunn and Beatty certified the statements as required by Section 302 of the Sarbanes-Oxley Act of 2002.

138. Additionally, in connection with Deloitte's review of Nortel's third quarter 2003 results, and 2002 restated results, Dunn, Beatty and Gollogly had provided Deloitte with a management representation letter – printed on Gollogly's letterhead – which remained completely silent about the nature and extent of their accounting schemes and the effect of such

schemes on Nortel's prior reported financial results.  The management representation letter,

dated November 18, 2003, falsely represented, among other things:

> (a)     The interim consolidated financial statements for the period ending September 30, 2003, and December 31, 2002 (as restated) are presented in conformity with US GAAP;

> (b)     They have no knowledge of any fraud or suspected fraud affecting the Company involving: management or other employees who have a significant role the Company's internal control over financial reporting, or others, where the fraud could have a material effect on the interim financial information;

> (c)     They have no knowledge of any allegations of fraud or suspected fraud affecting the Company in communications from employees, former employees, analysts, regulators, short sellers or others;

> (d)     Note 2 to the financial statements accurately summarize and describe he nature and amount of the restatement adjustments.  The Company has determined that sufficient procedures have been performed to conclude that the restatement adjustments are complete and are prepared and presented in conformity with US GAAP;

> (e)     There are no significant deficiencies, including material weaknesses, in the design or operations of internal controls that could adversely affect the Company's ability to record, process, summarize and report interim financial data.

139.     Dunn, Beatty and Gollogly's fraud finally crumbled in early 2004 when Nortel's

Audit Committee began to see evidence of the improper establishment and use of additional

reserves, beyond what had led to the First Restatement.  Over the next two months, Nortel

reluctantly concluded that it needed to restate its results for a second time.  The Company also

terminated Dunn, Beatty, Gollogly and several other senior finance managers.

140.     On January 11, 2005, Nortel issued a "Second Restatement," which restated Nortel's

liabilities by at least another $746 million and restated revenues by approximately $3.4 billion.

On January 10, 2005, in connection with Deloitte's audit of the Company's financial statements

for the period ending December 31, 2003, restated for 2002, Pahapill had signed a management

representation letter which falsely stated that, among other things, she knew of no fraud affecting

the Company that was not already disclosed to Nortel's outside auditor.

## FIRST CLAIM
### Violations of Securities Act Section 17(a)

141.    The Commission realleges and incorporates by reference each and every allegation

contained in Paragraphs 1 through 140 above.

142.    Defendants Dunn, Beatty, Gollogly and Pahapill, directly or indirectly, knowingly,

recklessly or negligently, in the offer or sale of Nortel securities, by use of the means or

instruments of transportation or communication in interstate commerce, or by use of the mails,

have each:  (a) employed devices, schemes or artifice to defraud; (b) obtained money or property

by means of untrue statement of material fact or omitted to state a material facts necessary to

make the statements made, in light of the circumstances under which they were made, not

misleading; or (c) engaged in transactions, practices or courses of business which operated or

would have operated as a fraud or deceit upon purchasers of Nortel securities.

143.    By engaging in the conduct alleged above, defendants Dunn, Beatty, Gollogly and

Pahapill have violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM
### Violations of Exchange Act Section 10(b)
### and Exchange Act Rule 10b-5 Thereunder

144.    The Commission realleges and incorporates by reference each and every allegation

contained in Paragraphs 1 through 143 above.

145.    Defendants Dunn, Beatty, Gollogly and Pahapill, directly or indirectly, by use of the

means or instruments of interstate commerce, or of the mails, or of a facility of a national

securities exchange, knowingly or recklessly:  (a) employed devices, schemes or artifices to

defraud; (b) made untrue statements of a material fact or omitted to state a material fact

necessary to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit on any person, in connection with the purchase or sale of securities

146.    By engaging in the conduct alleged above, defendants Dunn, Beatty, Gollogly and Pahapill have violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM
**Violations of Exchange Act Section 13(b)(5)
and Exchange Act Rule 13b2-1**

147.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 146 above.

148.    Defendants Dunn, Beatty, Gollogly and Pahapill knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records or accounts subject to Exchange Act Section 13(b)(2).

149.    Defendants Dunn, Beatty, Gollogly and Pahapill directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Exchange Act Section 13(b)(2).

150.    By engaging in the conduct alleged above, defendants Dunn, Beatty, Gollogly and Pahapill violated Exchange Action Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### FOURTH CLAIM
**Violations of Exchange Act Rule 13b2-2**

151.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 150 above.

152.    Defendants Dunn, Beatty, Gollogly and Pahapill directly or indirectly, (i) made or caused to be made materially false or misleading statements or (ii) omitted to state, or caused

others to omit to state, material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading, to an accountant in connection

with an audit, review or examination of financial statements or the preparation or filing of a

document or report required to be filed with the Commission.

153.    By engaging in the conduct alleged above, defendants Dunn, Beatty, Pahapill and

Gollogly violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

**FIFTH CLAIM**
**Violations of Exchange Act Rule 13a-14**
**(Defendants Dunn and Beatty Only)**

154.    The Commission realleges and incorporates by reference each and every allegation

contained in Paragraphs 1 through 153 above.

155.    Defendants Dunn and Beatty certified in Nortel's 2002 Form 10-K, its First, Second

and Third Quarter 2003 Forms 10-Q and its Amended 2002 Form 10-K that, among other things,

they reviewed each of these reports and, based on their knowledge, these reports:  (i) did not

contain any untrue statement of material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which they were made, not misleading

and (ii) included financial statements and other information which fairly present, in all material

respects, Nortel's financial condition, results of operations and cash flows.

156.    By engaging in the conduct alleged above, defendants Dunn and Beatty violated

Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

**SIXTH CLAIM**
**Aiding and Abetting Nortel's Violations of Exchange Act Section 13(a)**
**and Exchange Act Rules 12b-20, 13a-1 and 13a-13 Thereunder**

157.    The Commission realleges and incorporates by reference each and every allegation

contained in Paragraphs 1 through 156 above.

- 55 -

158.    Exchange Act Section 13(a), and Rules 13a-1 and 13a-13 thereunder, require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports.  Exchange Act Rule 12b-20 further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

159.    Nortel violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

160.    By engaging in the conduct alleged above, defendants Dunn, Beatty, Gollogly and Pahapill, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)], knowingly provided substantial assistance to and thereby aided and abetted Nortel in its violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

### SEVENTH CLAIM
**Aiding and Abetting Nortel's Violations
of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)**

161.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 160 above.

162.    Exchange Act Section 13(b)(2)(A) requires issuers to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the issuer's assets.  Exchange Act Section 13(b)(2)(B) requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with US GAAP and to maintain accountability for the issuer's assets.

163.     Nortel violated Section 13(b)(2)(A) during fiscal years 2000 through 2005 as alleged above and as further demonstrated by Nortel's three restatements, running into billions of dollars.  Likewise, by having insufficient internal controls to prevent the recording of erroneous, misleading and outright fraudulent entries, Nortel did not prepare its financial statements in accordance with US GAAP, and thus violated Section 13(b)(2)(B).  Nortel has admitted in its public filings to "material weaknesses in [its] internal controls over financial reporting."  Those control failures include:

- insufficient controls around the application of its internal accounting guidelines;

- insufficient controls around manual journal entries which allowed finance personnel to record entries in Nortel's general ledger without supporting documentation;

- insufficient controls over the preparation and review of post-closing adjustments;

- a lack of emphasis on the account reconciliation process;

- insufficient authority on the part of Nortel's accounting compliance organization to resolve accounting issues and insist upon accounting practices that conformed to US GAAP;

- the failure of Nortel's technical accounting function to proactively review contracts to establish an appropriate revenue recognition method;

- inconsistent application of revenue recognition methods across the Company;

- the failure of Nortel's internal audit function to provide an independent check on the integrity of Nortel's financial reporting to determine whether Nortel's accounting policies were in compliance with US GAAP, and to evaluate whether these policies were properly applied; and

- the lingering existence of multiple accounting systems which require thousands of manual journal entries to the general ledger system each quarter.

164.    Dunn, in particular, made known his lack of respect for Nortel's control organization, which he saw as an impediment to the Company's ability to do business quickly.  While serving as CFO, Dunn crafted and implemented a set of practices known as the "Fast Finance Initiative." While purportedly designed to streamline Nortel's processes by focusing attention on sales and customer service, the initiative instead de-emphasized Nortel's control function company-wide. A presentation on the Initiative given by Dunn at Nortel's May 2000 Senior Finance Conference directed employees to "[g]ive up on logic," "free [themselves] from the tyranny of managing useless detail," and ignore such non-revenue generating activities as reconciling accounts.

165.    By engaging in the conduct alleged above, defendants Dunn, Beatty, Gollogly and Pahapill, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)],  knowingly provided substantial assistance to and thereby aided and abetted Nortel in its violations  of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(a)    permanently restrain and enjoin each defendant from violating Securities Act Section 17(a), Exchange Act Sections 10(b) and 13(b)(5) and Exchange Act Rule 10b-5 and from aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) and Exchange Act Rules 12b-20, 13a-1, 13a-13, 13b2-1 and 13b2-2;

(b)    permanently restrain and enjoin defendants Dunn and Beatty from violating Exchange Act Rule 13a-14;

(c)     order each defendant to disgorge, with prejudgment interest, all ill-gotten gains, compensation, and benefits (whether realized, unrealized or received) by virtue of the conduct alleged herein;

(d)     pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], order each defendant to pay civil penalties;

(e)     pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], prohibit each defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)];

(f)     grant any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(2)]; and

(g)     grant such other relief as the Court may deem just and appropriate.

Dated: March 11, 2007
        Washington, DC                              Respectfully submitted,


                                         ___/s/ Suzanne J. Romajas_____
                                         Suzanne J. Romajas (SR-4531)
                                         Christopher R. Conte
                                         Timothy N. England
                                         Margaret S. McGuire
                                         Vincente L. Martinez

                                         Securities and Exchange Commission
                                         100 F Street, NE
                                         Washington, DC 20549-4030
                                         Tel: 202-551-4473 (Romajas)
                                         Fax: 202-772-9245 (Romajas)
                                         Email: RomajasS@sec.gov

                                         Counsel for Plaintiff