UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 07/30/08
```

- - - - - - - - - - - - - - - - - -X
                                   :
UNITED STATES SECURITIES           :
AND EXCHANGE COMMISSION,            :        07 Civ. 2058 (LAP)
                                   :
                  Plaintiff,       :            OPINION
                                   :
        v.                         :
                                   :
FRANK A. DUNN, DOUGLAS C. BEATTY,  :
MICHAEL J. GOLLOGLY, MARYANNE E.   :
PAHAPILL (a.k.a. MARY ANN POLAND), :
DOUGLAS A. HAMILTON, CRAIG A.      :
JOHNSON, JAMES B. KINNEY and       :
KENNETH R.W. TAYLOR,               :
                                   :
                  Defendants.      :
                                   :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, U.S.D.J.

        The U.S. Securities and Exchange Commission ("SEC") filed

this civil enforcement action on March 12, 2007,[1] alleging that

the defendants, various officers of Nortel Networks Corporation

("Nortel" or "the Company"), engaged in two distinct accounting

fraud schemes. Under the first scheme, Defendants Frank A. Dunn

("Dunn"), Douglas C. Beatty ("Beatty") and Maryanne E. Pahapill

---

[1] The SEC filed an Amended Complaint on September 12, 2007. For
the purposes of this Opinion, the generic term "Complaint"
refers to the operative pleading in this action, the Amended
Complaint.

("Pahapill")[2] (collectively, the "Revenue Recognition Defendants") allegedly adopted improper revenue recognition policies to inflate revenues reportable in the fourth quarter of 2000 (the "revenue recognition scheme"). Under the second scheme, Defendants Dunn, Beatty, Michael J. Gollogly ("Gollogly") and Douglas A. Hamilton ("Hamilton") (collectively, the "Earnings Management Defendants"), among others, are alleged to have improperly accrued, maintained and released reserves to manipulate Nortel's earnings in the fourth quarter of 2002 and the first two quarters of 2003 (the "earnings management scheme").[3] Currently pending before the Court are motions [dkt. nos. 17, 20, 24, 33, 35] to dismiss the Complaint filed by Dunn, Beatty, Pahapill, Gollogly[4] and Hamilton.[5] For the reasons set forth below, those motions are DENIED.

---

[2] The Complaint names as Defendant "Maryanne Pahapill" but notes that, on September 15, 2006, Pahapill resumed the use of her maiden name, Mary Anne Poland. (See Compl. ¶ 29.) For simplicity's sake, the Court will refer to Ms. Poland by the name used in the Complaint.

[3] The Complaint also names as defendants Craig A. Johnson, James B. Kinney and Kenneth R.W. Taylor. The claims against those Defendants have been resolved, and the Court entered judgment against each on May 1, 2008.

[4] Gollogly proceeds pro se and, in his motion papers, offers only that he "incorporates by reference the legal arguments stated in support of Frank A. Dunn's Motion to Dismiss the Amended Complaint, to the extent the legal arguments are applicable to Gollogly." (Memorandum of Law in Support of Defendant Michael J. Gollogly's Motion to Dismiss 1, SEC v. Dunn, No. 07 Civ. 2058

(continued on next page)

2

## I.  BACKGROUND

According to the Complaint, Nortel is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada, whose business is "the design, development, assembly, marketing, sale, licensing, installation, servicing and support for networking solutions." (See Compl. ¶ 34.) During the relevant periods, Nortel's common stock was registered with the SEC and traded on the New York and Toronto Stock Exchanges, and more than one-third of Nortel's workforce was employed in the United States. (See id.)

The Complaint describes the positions held by Defendants during each alleged fraud scheme. During the alleged revenue recognition scheme, Dunn was Nortel's CFO, Beatty was Nortel's Controller, and Pahapill was Nortel's Vice President of Corporate Reporting and Assistant Controller. (See id. ¶¶ 26-27, 29.)  During the alleged earnings management scheme, Dunn was

(continued from previous page)

(filed Nov. 28, 2007).)  Thus, decisions herein as to Dunn's general arguments about the insufficiency of the Complaint are equally applicable to Gollogly, but, in the absence of any motion addressed to the specific allegations against him, those allegations will not be separately evaluated.

[5] The Court refers to the following memoranda submitted in connection with the pending motions to dismiss:  "Beatty Mem.," "Dunn Mem.," "Hamilton Mem.," "Pahapill Mem.," "SEC Opp'n," "Beatty Reply," "Dunn Reply," "Hamilton Reply" and "Pahapill Reply."

Nortel's CEO (and, for a period, its Acting CFO), Beatty was

Nortel's CFO, Gollogly was Nortel's Controller, and Hamilton was

Nortel's Vice President of Finance in charge of Nortel's Optical

business unit ("Optical"). (See id. ¶¶ 26-28, 30.) The details

of those alleged fraud schemes are described below, taking the

facts alleged in the Complaint as true. See, e.g., Leatherman v.

Tarrant County Narcotics Intelligence & Coordination Unit, 507

U.S. 163, 164 (1993).


## A. Revenue Recognition Scheme

## 1. Fourth Quarter 2000 Projections

On July 25, 2000, Nortel made public its consolidated

financial results for the second quarter of that year in an

earnings release reviewed and approved by Dunn ("Second Quarter

2000 Earnings Release").[6] (See Compl. ¶ 38.) In that release,

Nortel projected an increase in anticipated revenue growth for

the year from 30-35 to 40 percent, attributing that increase to

the "momentum we have been experiencing during the first half"

of 2000. (Id.) On Nortel's Second Quarter 2000 Earnings Call,

---

[6] For the purposes of this Opinion, I refer to such documents as
"Earnings Releases." The Complaint also refers to the
following: telephone conferences in connection with the release
of Nortel's financial information for various periods (e.g.,
"Fourth Quarter 2000 Earnings Calls"); Nortel's quarterly
results filed with the SEC on Form 10-Q (e.g., "Fourth Quarter
2000 10-Q"); and Nortel's annual results filed with the SEC on
Form 10-K (e.g., "2000 10-K").

Dunn reiterated that prediction, further attributing the increase to an anticipated strong performance in Nortel's Optical unit, which he predicted would exceed $10 billion in sales for the year. (See id.)

Soon after the Second Quarter 2000 Earnings Release, however, Nortel internally lowered its expectations for the remainder of 2000. (See id. ¶ 39.) Revised revenue projections for the third quarter were at least $405 million lower than anticipated levels, and earnings were projected to miss previous targets by at least $506 million. (See id.) Other internal estimates projected that yearly revenue would be more than $1 billion less than expected and, specifically, that sales in the Optical unit would miss projections by at least $500 million. (See id. ¶ 40.) Dunn was informed of the lowered third quarter expectations by one of Nortel's finance vice presidents no later than September 15, 2000 (see id. ¶ 39); the yearly revenue and Optical sales projections were also shared with Dunn (see id. ¶ 40).

Nevertheless, Nortel continued to make optimistic forecasts about its prospects for the end of 2000. During Nortel's Third Quarter 2000 Earnings Call, Dunn allayed concerns about Optical's softening sales. (See id. ¶ 43.) He rejected the suggestion that growth was waning; instead, he attributed Optical's sales performance, which was reported at the low end

5

of Nortel's range of projections for the quarter, to the fact

that customers were slow to install optical equipment and were

working through existing inventories in the third quarter but

stated that customers were expected to place further orders in

the fourth quarter. (See id.) He did not mention Nortel's

revised internal projections, and, instead, Nortel reiterated

its anticipated increase in growth and continued to predict that

Optical's sales would surpass $10 billion. (See id.)

2. Nortel Reintroduces "Bill and Hold" Transactions

A "bill and hold" transaction is one where products that

have been sold to a buyer remain in the possession of the seller

until the buyer is willing to accept delivery. Though physical

delivery is generally required before revenue may be recognized

from the sale of a product, sellers are permitted to recognize

revenue at the time of sale but before physical delivery for

products sold on a bill and hold basis. See SEC Staff Accounting

Bulletin No. 101, 64 Fed. Reg. 68936, 68938-39 (Dec. 9, 1999)

(hereinafter "SAB No. 101"). The criteria required to classify

a transaction as a bill and hold sale, and thus to recognize

revenue on a product's sale before physical delivery, are

explained by the Commission in SAB No. 101. See id. at 68938

("This staff accounting bulletin summarizes certain of the

staff's views in applying generally accepted accounting

principles ["GAAP"] to revenue recognition in financial statements."). Among other things, that bulletin requires that "[t]he buyer, not the seller, must request that the transaction be on a bill and hold basis" and that the buyer "have a substantial business purpose for ordering the goods on a bill and hold basis . . . ." Id.

In June 2000, Beatty and Pahapill, allegedly with Dunn's knowledge, banned the use of bill and hold transactions, among other things, because GAAP requirements were thought to be too difficult to satisfy and because Nortel's revenues had been strong enough without recording revenue on a bill and hold basis. (See Compl. ¶ 47.) Given its weakening internal projections, however, Nortel soon reversed course. In late October 2000, Beatty and Pahapill met with other senior finance managers to discuss how to increase revenues, including by reconsidering Nortel's revenue recognition policies. (See id. ¶ 45.)[7] At around the same time, Beatty and Pahapill asked Nortel's outside auditor, Deloitte & Touche LLP ("Deloitte"), about the possibility of reintroducing bill and hold transactions. (See id. ¶ 48.) Deloitte presented them with

---

[7] The Complaint alleges that, at the time Beatty and Pahapill met with Nortel's finance personnel to explore avenues for increasing Nortel's reportable revenue, Nortel retained in its warehouses substantial inventory of merchandise, particularly from the Optical unit. (See Compl. ¶ 46.)

7

charts explaining GAAP's requirements to guide Nortel personnel in assessing whether revenue from particular sales of Nortel products could be recognized on a bill and hold basis (see id. ¶ 50), but Beatty and Pahapill instead prepared their own guidance (the "internal guidance") which omitted key GAAP requirements (see id. ¶ 51). Deloitte protested, concluding that the internal guidance did not provide its intended users with enough information properly to assess the propriety of a bill and hold sale and asked Pahapill to distribute its guidance to Nortel personnel together with the internal guidance. (See id. ¶ 52.) Pahapill demurred and, on November 7, 2000, distributed solely the internal guidance to certain Nortel accounting and finance personnel. (See id. ¶ 51.)

On November 8, 2000, Beatty informed the recipients of the internal guidance that Nortel was reintroducing bill and hold transactions in an attempt to meet fiscal year 2000 fourth quarter revenue targets and directed them to formulate a plan to implement the new strategy. (See id. 54.) The recipients of the internal guidance returned to Beatty and Pahapill with a plan where Nortel's sales force would approach customers and urge them to purchase Nortel products on a bill and hold basis. (See id. ¶ 55.) To effect the transactions, Nortel sales personnel would draft and forward to the customers "risk of loss" letters to be typed on customer letterhead. (See id. ¶ 58.) They

targeted both customers who were expected to place orders in 2001, as well as new customers; they also asked customers with existing orders for 2001 to restructure their deals to include risk of loss terms. (See id. ¶ 56.) Such customers were offered price discounts, interest deferments and extended billing terms to induce them to purchase goods on a bill and hold basis. (See id.)[8] Soon thereafter, Beatty and Pahapill were approached by Nortel compliance personnel who were concerned that the manner in which Nortel was obtaining risk of loss letters did not comply with GAAP requirements. (See id. ¶ 59.) During a December 8, 2000, conference call to address that concern, Beatty told compliance personnel that the transactions at issue were compliant so long as the risk of loss terms were evidenced on customer letterhead. (See id.) He also directed compliance personnel not to raise the issue again with Nortel's sales people. (See id.)

---

[8] The Complaint also alleges that Nortel improperly recognized revenue on sales to Telamon Corporation ("Telamon"), a minority-owned business that resold Nortel products to Nortel customers who were required to make a certain percentage of purchases from such businesses. (See Compl. ¶¶ 62-63.) The Complaint alleges that Nortel recognized revenue upon delivery of goods to Telamon but that Telamon did not accept the risks of ownership at that time. (See id. ¶ 64.) Instead, Telamon did not pay Nortel until Telamon had received payment from its customers and routinely returned unsold products to Nortel. (Id.) In the fourth quarter of 2000, Dunn, Beatty and Pahapill allegedly considered and rejected the possibility of reversing Telamon entries because it would have an adverse effect on Optical revenues for fiscal year 2000. (Id. ¶ 66.)

9

The plan was so successful that, by the end of 2000, more revenue was recognizable on a bill and hold basis than was necessary to meet Nortel's fourth quarter 2000 revenue projections. (See id. ¶ 68.) Therefore, on January 5, 2001, Beatty instructed Pahapill and other Nortel finance vice presidents to identify low-value bill and hold entries that could be reversed; however, because it was critical to preserve Optical's revenue, Beatty instructed that such reversals could only occur in non-Optical units. (See id. ¶ 69.) On January 7, 2001, Dunn, Beatty, Pahapill and others conducted a telephone conference to discuss and review each proposed reversal and select those that would reduce overall revenue while maintaining Optical revenues. (See id. ¶ 70.)[9]

On January 18, 2001, Nortel made public its Fourth Quarter 2000 Earnings Release, which was reviewed and approved by Dunn (see id. ¶ 74), and subsequently filed its 2000 10-K with the

---

[9] After the January 7 conference call, a participant allegedly sent a confidential email to other participants, stating that "'we need to ensure that we have a crisp story on why we reversed these entries for the auditors,'" and, at about the same time, Beatty informed a Deloitte partner that "Nortel had reversed certain revenue entries as part of a normal-course review conducted during its year-end closing process." (Compl. ¶ 71.)

10

SEC on March 13, 2001 (see id. ¶ 76).[10] In each, Nortel announced that it had met its projections for the fourth quarter and the year; in the Earnings Release, it announced further, albeit lower, anticipated growth for 2001. (See id. ¶ 74. ("'[T]he fourth quarter capped a year of exceptional growth, which was in line with . . . expectations.'"); see also id. ¶ 76 (Nortel reported $8.818 billion in quarterly revenue and $30.275 billion in yearly revenue).)[11] Among other Nortel business units, the 2000 Earnings Release touted Optical's performance, noting that revenues "'topped $10 billion for the year, more than doubling 1999 revenues,'" driven by "strong growth" in the

---

[10] Beatty and Pahapill allegedly were responsible for preparing Nortel's consolidated financial results for the fourth quarter and the year for fiscal year 2000. (See Compl. ¶ 73.) Pahapill prepared Nortel's 2000 10-K. (Id.) Dunn participated in the review of Nortel's financial information, reviewed and approved the financial statements prior to public release and also signed Nortel's 2000 10-K. (Id.)

[11] The Complaint describes how various of the statements contained in Nortel's Fourth Quarter 2000 Earnings Release and Nortel's 2000 10-K were misleading (see Compl. ¶¶ 74, 76) and alleges that Dunn, Beatty and Pahapill "knew, or were reckless in not knowing," that those statements were misleading (see id. ¶¶ 78-79). It also describes a February 1, 2001, management representation letter provided to Deloitte by Dunn and Beatty in connection with Deloitte's audit of Nortel's financial results for the year 2000, which letter allegedly made false representations about Nortel's financial accounting of the results for that period. (See id. ¶ 72.)

11

United States and elsewhere. (Id. ¶ 74.)[12]

B. Earnings Management Scheme

1. Identification of Excess Reserves

The Complaint explains that, in 2001, as a result of losses sustained from an overall downturn in the telecommunications sector, Nortel initiated a company-wide restructuring plan that included substantial reductions in workforce, write-downs of assets and contract settlements. (See id. ¶ 81.) In the summer of 2002, however, Dunn (then Nortel's CEO) reported that he expected Nortel to return to profitability by the second quarter of 2003 (see id. ¶ 98 (quoting Dunn and Beatty during Nortel's Second and Third Quarter 2002 Earnings Calls)) and created a "return to profitability" ("RTP") bonus program for Nortel employees as an incentive to meet that goal (see id. ¶¶ 82-83).

Around the same time, analysts began to question why Nortel maintained such large reserves and expressed concern as to whether Nortel could satisfy those outstanding liabilities. (See id. ¶ 91.) According to the Complaint, "it was long-standing practice across Nortel to establish reserves on a 'worst-case'

---

[12] The Complaint also notes that, in February 2001, Nortel consummated its acquisition of 980 NPLC, the Switzerland-based subsidiary of JDS Uniphase. (See Compl. ¶ 75.) To finance the $2.5 billion deal, Nortel issued 65.7 million shares of Nortel common stock at an allegedly inflated price that reflected its 2000 year-end misstated financials. (See id.)

12

basis, which, in practice, meant at an amount equal to the maximum exposure." (Id. ¶ 85.)[13]  Dunn emphasized this practice by exhorting employees to create sufficient reserves (see id. ¶ 88 ("Dunn communicated to employees that he wanted to deal with liabilities once and not readdress them in the future.")) and encouraging the creation of excess reserves when quarterly results exceeded forecasts (see id. ¶ 89 ("'[Nortel's] general approach is to sand bag good news and close 'hard' to the forecast.'")).[14]  Thus, not only did Nortel carry excess reserves that it had created in the general course of business, but

---

[13] The Complaint contrasts Nortel's liability reserve policies to the allegedly correct accounting treatment under GAAP.  It states that an anticipated liability can be accrued, and a reserve created therefor, if the contingent events are likely to occur and the loss amount can be reasonably ascertained. (See Compl. ¶ 86.)  Further, it alleges that reserves should be released into the quarter in which they are no longer needed, either when the potential liability is resolved or when an excess is identified. (See id. ¶ 87.)  Moreover, a company releasing reserves must disclose the effect of the release on the current period and what effect would have resulted if the reserve had been timely released. (Id.)

[14] This allegation conforms to the SEC's earlier allegation that "Nortel's top executives had long instilled the Company with an extremely target-driven culture" and that "either missing or exceeding a financial target reflected a failure to manage the Company's business properly." (Compl. ¶ 36.)  Dunn allegedly reinforced that culture by "reviewing and inquiring about particular accounting entries during the quarterly and year-end closing processes, and, more generally, through his constant emphasis on the importance of hitting targets and his well-known disregard for internal accounting and financial controls." (Id.)

13

Nortel "also 'topped up' existing reserve accounts in 2001, when it underwent its company-wide restructuring." (Id. ¶ 90.)

In response to analysts' concerns about Nortel's excess reserves, Beatty instructed Nortel personnel to ascertain the quantity and status of Nortel's reserve balances. (Id. ¶ 92.) Each of Nortel's business units undertook this reserve review process, and, thus, in October 2002, Hamilton reported that Optical was holding approximately $21 million in excess reserves. (See id. ¶ 94.) After compiling all the reserve estimates, staff reported to Beatty and Gollogly in October 2002 that Nortel was carrying at least $303 million in excess reserves. (See id. ¶ 96.)[15] Beatty informed Dunn of this fact in early November 2002. (See id. ¶ 97.) The Complaint alleges that, instead of determining the appropriate accounting treatment for those excess reserves identified during this process, Dunn, Beatty and Gollogly instructed that those excess reserves be maintained on Nortel's books for future earnings management purposes. (See id.)

---

[15] The Complaint also alleges that some of the reserve accounts identified by Nortel staff had "loosely-identified purposes." (Compl. ¶ 96.) Thus, "[o]ne account was simply labeled 'General Provision,' which the corporate control staff described as 'left in place per Doug Beatty.' Another account labeled 'F. Dunn Discretionary Provision' was described by Nortel's corporate control staff as 'left in place per Frank Dunn.' Other reserve accounts were maintained on justifications that shifted from period to period." (Id.)

14

2.  Creation of Further Excess Reserves

Though Dunn and Beatty had predicted Nortel's return to profitability by the second quarter of 2003 (see id. ¶¶ 82-83, 98), internal projections showed that Nortel would report a pro forma profit by the fourth quarter of 2002 (see id. ¶ 99). This information was conveyed to Dunn, Beatty and Gollogly, causing Dunn particular concern: a pro forma profit would trigger the payment of RTP bonuses, and shareholders, thought Dunn, would "not react favorably to the payment of millions of dollars of bonuses at the end of a year in which the Company lost over $3 billion from its continuing operations." (Id.) Dunn and Beatty were further concerned that, should Nortel report a loss in the first quarter of 2003, as internal projections forecast, the profits reported in the fourth quarter of 2002 would appear to be an aberration and not the stable return to profitability that they had forecast. (See id. ¶ 100.)

Thus, Dunn and Beatty ordered the creation of excess reserves to reduce Nortel's fourth quarter 2002 earnings. (See id.) Gollogly coordinated the reserve establishment effort, instructing the vice presidents in charge of Nortel's business units to accrue additional reserves. (See id. ¶ 101.) Dunn and Beatty also contacted some business unit heads directly (see id.), and, on or about January 6, 2003, Beatty conducted a

15

telephone conference with Hamilton and others reiterating that they were required to establish additional excess reserves "because the Company's results were coming in better than expected" (id. ¶ 102).

Each business unit's proposed reserve entries, including Hamilton's proposed $7 million in Optical reserves (see id. ¶ 103), were submitted to Gollogly in early January 2002, who then selectively incorporated enough of the proposed reserves to reduce fourth quarter earnings to "within a few million dollars of the $65 million loss" previously predicted by Dunn and Beatty (id. ¶ 104). According to the Complaint, this feat required some last minute finagling: the day before fourth quarter earnings were announced, Nortel decided to change its accounting treatment of the acquisition of 980 NPLC. (See id. ¶ 105; see also supra n.12.) That change decreased Nortel's fourth quarter 2002 earnings by an additional $25 million. (See Compl. ¶ 105.) To counter that decrease, Beatty and Gollogly reversed $25 million of the reserve entries previously created by Nortel's business unit heads and which had been vetted and selected by Gollogly. (See id.)

On January 23, 2003, Nortel made public its Fourth Quarter 2002 Earnings Release, which was reviewed and approved by Dunn

and Beatty (see id. ¶ 108),[16] and filed its 2002 10-K with the
SEC on March 10, 2003 (see id. ¶ 109). Reiterating Dunn's
prediction that Nortel would operate "just short of pro forma
profitability," both reported a quarterly pro forma loss of $62
million and a quarterly GAAP loss of $248 million. (See id.
¶¶ 108-09.)[17]


3.    First Quarter 2003 Release of Excess Reserves

In addition to affecting earnings in 2002, the accounting
adjustment associated with Nortel's acquisition of 980 NPLC led
Nortel personnel to adjust earnings forecasts for fiscal year
2003 from a projected profit to a net loss. (See id. ¶ 115.)
Nevertheless, Dunn and Beatty continued publicly to forecast
profitability in 2003 (see id. ¶¶ 116-17); indeed, Dunn regarded
the possibility of not achieving profitability to be
particularly ominous because he considered the payout of RTP

---

[16] Hamilton was responsible for preparing and submitting
Optical's financial data for consolidation into Nortel's fourth
quarter 2002 financial statements. (See Compl. ¶ 107.)
Gollogly, with Beatty's participation, was responsible for
preparing those consolidated financial statements, and Dunn and
Beatty reviewed and approved them and related disclosures. (See
id.)

[17] According to the Complaint, Dunn, Beatty and Gollogly "knew,
or were reckless in not knowing," that the Nortel's Fourth
Quarter 2002 Earnings Release and its 2002 10-K contained
statements that misrepresented and/or omitted various material
facts regarding Nortel's selective accrual and maintenance of
reserves. (See Compl. ¶ 111.)

bonuses essential to maintaining his management team (see id. ¶ 119).

Therefore, Dunn and Beatty instructed Nortel staff to create "roadmaps" to ensure Nortel reported profitability in 2003. (See id. ¶ 118.) Distributed to Dunn, Beatty and Gollogly, the resulting roadmaps included revised consolidated earnings targets for each of Nortel's business units and specified amounts each unit was expected to contribute to reach Nortel's overall earnings targets. (See id. ¶ 120.) In a telephone conference on or about February 19, 2003, Beatty discussed those contribution amounts with the heads of Nortel's business units, including Hamilton. (See id. ¶ 121.) Soon thereafter, the business unit heads, including Hamilton, indicated that they intended to meet their earnings contributions targets by releasing excess reserves and the amounts they planned to release were incorporated into the roadmaps. (See id.)[18]

Ultimately, Nortel met earnings targets for the first quarter of 2003 through the release of $361 million in reserves, $272 million of which were released specifically at the

---

[18] According to the Complaint, economic conditions worsened during the process of estimating each business unit's reserve releases, and internal projections provided to Dunn, Beatty and Gollogly forecast further earnings shortfalls. (See Compl. ¶ 122.) Consequently, the roadmaps were revised to increase Corporate- and business unit-level reserve releases. (See id.)

18

direction of Dunn, Beatty and Gollogly. (See id. ¶ 123.) Of

that $272 million, Hamilton caused $78 million of reserves

accrued or maintained at Optical to be released on Optical's

books into earnings. (See id. ¶ 124.) Additionally, Nortel's

pro forma profit for the quarter triggered the payment of RTP

bonuses for Nortel employees. (See id. ¶ 152.)

On April 24, 2003, Nortel made public its First Quarter

2003 Earnings Release, which was reviewed and approved by Dunn

and Beatty. (See id. ¶ 126.)[19]  In Nortel's First Quarter 2003

Earnings Call, Dunn attributed Nortel's performance to a strong

business model. (See id. ("'We had a very strong margin of

performance and we continue to focus on driving a business model

that continues to accelerate our margin as an overall objective

in this business.'").)  In addition, in its First Quarter 2003

10-Q, filed with the SEC on May 9, 2003, Nortel reported that

nearly $80 million was included in net earnings that resulted

from "'reductions in accruals principally related to the wind-

---

[19] As was the case in the fourth quarter of 2002, Hamilton was
responsible for preparing and submitting Optical's financial
data for consolidation into Nortel's first quarter 2002
financial statements. (See Compl. ¶ 125.)  Gollogly, with
Beatty's participation, was responsible for preparing those
consolidated financial statements; Dunn, Beatty and Hamilton
reviewed the financial statements and related disclosures, and
Dunn and Beatty subsequently approved them. (See id.)
Furthermore, Dunn and Beatty certified Nortel's financial
statements under Sarbanes-Oxley § 302. See Sarbanes-Oxley Act of
2002, Pub. L. No. 107-204, § 302, 116 Stat. 745, 777-78 (2002)
(codified at 15 U.S.C. § 7241); see also Compl. ¶ 125.

down or integration activities'" of previously-acquired
companies. (Id. ¶ 127.)[20]

4.  Second Quarter 2003 Release of Excess Reserves

The earnings management scheme allegedly continued into the
second quarter of 2003, with Nortel's intended release of
approximately $514 million in reserves, $370 million of which
were designed solely to meet earnings projections. (See id.
¶ 133.) This time, however, nearly $142 million in planned
releases had to be reversed after Deloitte expressed concern
about the absence of support to justify the propriety and timing
of those releases. (See id.)

Specifically, when it became apparent that Nortel could not
furnish sufficient support for the $80 million in reserve
releases it reported in the first quarter of 2003, Deloitte
cautioned Gollogly and informed Nortel's Audit Committee that
the propriety of Nortel's reserve releases would require
Deloitte's attention. (See id. ¶¶ 134-35.) In a later meeting

---

[20] The Complaint alleges that Dunn, Beatty and Gollogly "knew, or
were reckless in not knowing," that the First Quarter 2003
Earnings Release and the First Quarter 2003 10-Q included
various material misrepresentations and/or omissions about
Nortel's release of reserves. (See Compl. ¶ 129.) It also
describes a May 2003 management representation letter provided
to Deloitte by Dunn, Beatty and Gollogly in connection with
Deloitte's audit of Nortel's financial results for the first
quarter of 2003, which letter allegedly made false
representations about Nortel's financial accounting of the
results for that period. (See id. ¶ 131.)

20

of Nortel's Audit Committee, Deloitte suggested that Nortel should release reserves in the future only after management had reviewed those releases and specifically determined them to be adequately supported. (See id. ¶ 135.) With the approval of Dunn and Beatty, Gollogly tasked Nortel personnel to undertake such a review during the second quarter 2003 closing process and, in July 2003, disclosed to Deloitte that $142 million in proposed reserve releases for that quarter were unsupported. (See id. ¶¶ 136-37.) On or about July 7, 2003, Deloitte asked Nortel not to release that $142 million in reserves and, at yet another Audit Committee meeting, informed that Committee that a "reportable condition" had occurred under Statement of Auditing Standards No. 60 ("SAS No. 60") with respect to Nortel's reserve releases. (See id. ¶ 138.)[21]

Despite reversing those entries, however, the Complaint alleges that Nortel still released approximately $372 million in reserves into second quarter earnings (see id. ¶ 139) and, though recording a GAAP loss, reported a pro forma profit, again triggering the payment of further RTP bonuses (see id. ¶ 152). Of the $372 million in reserve releases, approximately $228

---

[21] Effective December 15, 2006, SAS No. 112 superseded SAS No. 60. It describes principles to guide auditors "on communicating matters related to an [audited] entity's internal control over financial reporting identified in an audit of financial statements." See SAS No. 112.01.

21

million were specifically designed to meet earnings targets (see id. ¶ 139), including approximately $54 million in Optical reserves that Hamilton caused to be released and that were ultimately consolidated into Nortel's second quarter financial statements (see id. ¶ 141).[22]

## 5. The Restatements

As concern grew about its reserve release practices, the Complaint alleges that Dunn, Beatty and Gollogly misled the public and Deloitte about the extent and nature of Nortel's review of its reserve releases. For instance, in its Second Quarter 2003 Earnings Release, Nortel stated that it had reviewed its reserve balances because in 2003, unlike prior years, "'relatively minor amounts may have a greater effect on reported results.'" (See id. ¶ 159.) Beatty reiterated the same justification in Nortel's Second Quarter 2003 Earnings Call (see id.), and Nortel's Second Quarter 2003 10-Q filed with the SEC on August 12, 2003, contained similar statements (see id. ¶ 161). According to the Complaint, those statements misleadingly failed to state that the true reason Nortel

_____

[22] In light of Nortel's second quarter 2003 reserve releases, the Complaint alleges that Nortel's Second Quarter 2003 Earnings Release, Second Quarter 2003 10-Q and management representation letter delivered to Deloitte each contained material false statements concerning Nortel's reserve releases. (See Compl. ¶¶ 143-49.)

22

reviewed its reserve practices was because Deloitte had

expressed concern as to their propriety. (See id. ¶ 160.)

On October 23, 2003, the same day that Dunn and Beatty

publicly forecast profitable results for the third quarter 2003

(see id. ¶ 163), Nortel announced that it would restate its

financial statements (the "First Restatement") (see id. ¶ 164).

As alleged in the Complaint, Dunn and Beatty continued to

mislead the public, this time about the First Restatement, by

characterizing it as "an effort to clean up honest control

lapses in prior years." (Id.) On Nortel's Third Quarter 2003

Earnings Call, for instance, Dunn explained that, during "'a

period of dramatic restructuring,'" Nortel had discovered some

"'mistakes'" in its accounting (id. ("'[T]he challenges that

faced Nortel Networks and our industry over the past few years

were unprecedented . . . . It is clear now that in such a

volatile environment, errors were made.'")), and Beatty made

similar comments on the same call (see id. (stating that Nortel

had decided to review reserves because "the 'impact of

materiality' had recently changed as Nortel's results were

'picking around along break-even.'")).

On November 19, 2003, Nortel filed the First Restatement as

part of its Third Quarter 2003 10-Q, restating approximately

23

$948 million in total liabilities. (See id. ¶ 166.)[23] As alleged in the Complaint, however, the "First Restatement was, in reality, a cover-up" (id. ¶ 13): not only did it offer the same allegedly misleading justifications as had been offered previously for Nortel's reserve review, but it gave no indication of the misconduct that had precipitated the restatement and was so narrowly-focused that it did not capture much of the improper reserve releases effectuated to date (see id. ¶ 166).

In early 2004, however, as Nortel's Audit Committee allegedly began to unearth the true extent of the earnings management scheme, it determined that a further restatement was necessary. (See id. ¶¶ 169.) Soon thereafter, Nortel terminated Dunn, Beatty, Gollogly and Hamilton's employment for cause. (See id.) On January 11, 2005, Nortel issued its Second Restatement, restating a further $746 million in liabilities and

---

[23] Gollogly, with Beatty's participation, prepared the restated financial results reported in the First Restatement, and Beatty and Dunn reviewed and approved those statements, including by certifying them under Sarbanes-Oxley § 302. (See Compl. ¶ 167.) In addition, Dunn, Beatty and Gollogly delivered to Deloitte another management representation letter in connection with its audit of Nortel's third quarter 2003 financial results. (See id. ¶ 168.)

approximately $3.4 billion in revenues. (See id. ¶ 170.)[24] The Second Restatement also disclosed the conclusion of the Audit Committee's independent review of Nortel's reserve practices that "Dunn, Beatty and Gollogly were responsible for Nortel's improper use of reserves in the second half of 2002 and first half of 2003." (Id. ¶ 170.) Further, in its 2005 10-K filed with the SEC in May 2006, Nortel for the first time disclosed that it had restated revenues in part due to an accounting fraud in which "'the senior corporate management team . . . changed accounting policies of the Company several times during 2000' and that those changes were 'driven by the need to close revenue and earnings gaps.'" (Id. ¶ 172.)

## II. DISCUSSION

Among other things, the Complaint asserts claims against all Defendants for fraud and fraudulent misrepresentations in violation of § 17(a) of the Securities Act of 1933 (Claim 1) and § 10(b) of the Securities Exchange Act of 1934 and corresponding Rule 10b-5 (Claim 2). To state a violation of either § 10(b) or Rule 10b-5, the SEC must allege that a defendant "(1) made a

---

[24] In connection therewith, Pahapill signed a management representation letter delivered to Deloitte in which she stated, among other things, that "she knew of no fraud affecting the Company that was not already disclosed to Nortel's outside auditor." (Id. ¶ 171.)

25

material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). "[E]ssentially the same elements must be established in connection with the offer or sale of a security" to state a violation of § 17(a). See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996).

On these motions, Defendants challenge principally the SEC's allegations of scienter, arguing that the facts in the Complaint bespeak mere accounting mistakes, not intentional wrongdoing. (See, e.g., Dunn Mem. 7-8.) Dunn, Beatty and Hamilton each also argues that, even if there was intentional misconduct at Nortel, the Complaint lacks allegations specific to each demonstrating his intentional misconduct. (See, e.g., id. at 22; Beatty Mem. 8, 15; Hamilton Mem. 14.) I address these arguments below collectively as the "scienter arguments." Taking all factual allegations in the Complaint as true, see Leatherman, 507 U.S. at 164, I conclude that the facts in the Complaint sufficiently allege that (i) the Revenue Recognition Defendants intentionally adopted revenue recognition policies that they knew violated GAAP (see infra Pt. II.B.1), and (ii) the Revenue Recognition Defendants recklessly disregarded the possibility that Nortel's reserve accounting policies violated

GAAP (see infra Pt. II.B.2). I further conclude (iii) that
specific facts alleged illustrate Beatty's knowing participation
in (see infra Pt. II.C.1(a)) and Dunn's reckless ignorance of
(see infra Pt. II.C.1(b)) the revenue recognition scheme; (iv)
that specific facts alleged show Dunn and Beatty's personal
participation in the formulation and implementation of Nortel's
reserve accounting policies (see infra Pt. II.C.2(a)); and (v)
that specific facts alleged show Hamilton's participation in the
earnings management scheme in reckless disregard for the
requirements of GAAP (see infra Pt. II.C.2(b)(ii)).[25]

In addition, Pahapill argues that the Complaint must be
dismissed against her for reasons similar to those endorsed by
Judge Kaplan in United States v. Stein, 435 F. Supp. 2d 330
(S.D.N.Y. 2006), aff'd, No. 07-3042-Cr., 2008 WL 3982104 (2d
Cir. Aug. 28, 2008); see also Pahapill Mem. 12-13. I reject
that argument for the reasons stated below. (See infra
Pt. II.D.)

Before taking up those arguments, however, I turn to the
standards applicable to these motions.

---

[25] Before so concluding as to Hamilton, I also conclude that this
Court may exercise personal jurisdiction over him. (See infra
Pt. II.C.2(b)(i).)

27

A.   Pleading Scienter Under Rule 9(b) and the Private
     Securities Litigation Reform Act ("PSLRA")

Rule 9(b) of the Federal Rules of Civil Procedure

establishes standards that govern pleading allegations of fraud.

See, e.g., Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).

It states that:

    In alleging fraud or mistake, a party must state with
    particularity the circumstances constituting fraud or
    mistake.  Malice, intent, knowledge, and other
    conditions of a person's mind may be alleged
    generally.

Fed. R. Civ. P. 9(b).  Discussing that rule in the securities

fraud context, however, the Court of Appeals for the Second

Circuit cautioned that "the relaxation of Rule 9(b)'s

specificity requirement for scienter must not be mistaken for

license to base claims of fraud on speculation and conclusory

allegations." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124,

1128 (2d Cir. 1994) (quotations omitted).  Instead, to plead

scienter adequately in such an action, a complaint was required

to allege facts giving rise to a "strong inference" of

fraudulent intent. Cf. Ross v. A. H. Robins Co., Inc., 607 F.2d

545, 558 (2d Cir. 1979); Denny v. Barber, 576 F.2d 465, 470 (2d

Cir. 1978).  Such a strong inference could be established "(a)

by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields, 25 F.3d at 1128.[26]

Not all Courts of Appeals endorsed the Second Circuit's interpretation that Rule 9(b) requires allegations giving rise to a "strong inference" of scienter in securities fraud cases. See, e.g., Tellabs, 127 S.Ct. at 2507-08 (collecting cases). Partly to achieve uniformity on that issue, see id. at 2508, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), see Pub. L. No. 104-67, 109 Stat. 737 (Dec. 22, 1995) (codified in part at 15 U.S.C. § 78u), which "heightened the requirement for pleading scienter to the level [adopted] by the Second Circuit: Plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with

_____

[26] The Supreme Court has not decided whether recklessness is sufficient to establish scienter under § 10(b) and Rule 10b-5, leaving undisturbed this Circuit's precedent holding that it is. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2507 n.3 (2007); see also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1974). Discussing those standards, the Court of Appeals has noted that, while "[i]ntentional misconduct is easily identified since it encompasses deliberate illegal behavior, . . . [r]ecklessness is harder to identify with such precision and consistency." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). It has described recklessness as "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39-40 (2d Cir. 2000) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (recklessness is "[a]n egregious refusal to see the obvious, or to investigate the doubtful").

the required state of mind.'" Press v. Chem. Inv. Servs. Corp.,
166 F.3d 529, 537-38 (2d Cir. 1999) (quoting 15 U.S.C. § 78u-
4(b)(2)). Because no good deed goes unpunished, however,
divergence persisted after passage of the PSLRA: the Courts of
Appeals disagreed about what constituted a "strong inference" of
fraudulent intent and, specifically, whether Congress intended
to codify pre-existing Second Circuit caselaw in that area.
Compare id. at 538 (adopting Second Circuit precedent), and In
re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3rd Cir. 1999)
("[T]he [PSLRA] establishes a pleading standard approximately
equal in stringency to that of the Second Circuit."), with In re
Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 978 (9th Cir.
1999) ("Congress did not codify the Second Circuit case law [but
rather] sought to raise the standard above all existing
requirements.").

The Supreme Court resolved that divergence in Tellabs. It
clarified that Congress had not codified pre-existing Second
Circuit precedent, see Tellabs, 127 S.Ct. at 2509; see also In
re Silicon Graphics, 183 F.3d at 978 ("[A]lthough Congress
derived the PSLRA 'strong inference' language from the Second
Circuit, it rejected the less stringent Second Circuit case law
interpreting that 'strong inference' language."), and held that
an inference of scienter would satisfy the PSLRA's "strong
inference" standard "only if a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S.Ct. at 2510. The Court explained that a district court "must take into account plausible opposing inferences," id. at 2509, and, while the inference of scienter "need not be irrefutable . . . or even the most plausible of competing inferences," id. at 2510 (quotation omitted), it "must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." Id.

Of course, by its terms, the PSLRA does not apply to this SEC enforcement action. See 15 U.S.C. § 78u-4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter"); see also Dunn Mem. 21 n.8. Nevertheless, Defendants ask this Court to apply the PSLRA's "strong inference" standard in lieu of the Second Circuit's Rule 9(b) "strong inference" standard. (See Beatty Mem. 7; Dunn Mem. 21 n.8; Hamilton Mem. 13-14.) Under the PSLRA's comparative standard, argue Defendants, the SEC fails to allege fraud because, taking the Complaint as true, the inference of intentional misconduct is not as plausible as other non-culpable inferences. (See Dunn Mem. 9-11, 16.) They portray the alleged conduct at Nortel as a series of innocent mistakes about complicated accounting principles and argue that "[a]ccounting mistakes, even mistakes that require a company's financial

31

results to be restated, do not constitute fraud." (Id. at 7; see also id. at 8 ("[T]o determine whether a securities fraud plaintiff has sufficiently alleged not just accounting mistakes but intentional deception, courts must weigh competing inferences, including inferences favorable to defendants." (citing Tellabs, 127 S.Ct. at 1965)).)

The Court of Appeals has yet to decide Tellabs' effect on the requirements for pleading scienter in actions governed by Rule 9(b) but not governed by the PSLRA. See SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 488 (S.D.N.Y. 2007) (noting question but declining to decide "whether district courts must now [after Tellabs] find that the inference of scienter raised in actions not governed by the PSLRA, but governed by Rule 9(b), be at least as compelling as any other inference"). Nevertheless, I decline Defendants' invitation to extend the PSLRA "strong inference" formulation beyond the limits of the PSLRA. Any argument that Congress intended to apply the provisions of the PSLRA to SEC enforcement actions ignores the statute's plain language. See 15 U.S.C. § 78u-4(a)(1). Indeed, as the Supreme Court explained, Congress designed the PSLRA specifically to address the perceived abuses of private securities litigation. See Tellabs, 127 S.Ct. at 2508. Extending its "heightened standard" to SEC enforcement actions, a context not found by Congress to harbor such abuses, does

violence to that intent: had Congress wanted the PSLRA to restrain the SEC's ability to plead securities fraud, it could have said so easily.

Nor does the Tellabs decision indicate any intention to announce a broader Rule 9(b) standard. Defendants cling to the thin reed that both standards bear the same name (see Dunn Mem. 21 n.8), but that fact does not illustrate Congress' attempt to usurp the broader Rule 9(b) jurisprudence. See, e.g., In re Silicon Graphics, 183 F.3d at 979 ("Congress adopted the Second Circuit's 'strong inference' language only because it was facially more stringent than the 'reasonable inference' standard in other circuits."). Instead, as the Supreme Court acknowledged in Tellabs, the PSLRA created a distinct, heightened pleading standard for private securities actions, separate and apart from the general requirements of Rule 9(b). See Tellabs, 127 S.Ct. 2509 ("While adopting the Second Circuit's 'strong inference' standard, Congress did not codify that Circuit's case law interpreting the standard."); see also 2 James Wm. Moore, Moore's Federal Practice § 9.03[6][a][i] (3d ed. 2008) (noting that PSLRA's pleading standards supplement Rule 9(b) requirements). It was that distinct, heightened pleading standard that formed the subject matter of the Tellabs decision, not the broader Rule 9(b) standards.

Defendants cite two decisions from this District for the proposition that the Tellabs PSLRA "strong inference" test should apply in the broader Rule 9(b) context, but neither is persuasive.[27] In In re Crude Oil Commodity Litig., 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007), the court cited Tellabs and Bell Atlantic v. Twombly, 127 S.Ct. 1955, 1969 (2007), to support its contention that the "adoption of a heightened pleading standard in the context of [market manipulation claims under § 9(a)(2) Commodities Exchange Act ("CEA")] is in conformity with the direction of the Court." See In re Crude, 2007 WL 1946553 at *7 n.5. That court's recognition of the Supreme Court's recent precedent imposing stricter pleading standards, however, does not offer Defendants any support here. To the contrary, in assessing scienter under the CEA, the In re Crude court explicitly employed the Second Circuit's pre-Tellabs Rule 9(b) "strong inference" standard. See id. at *8 (quoting Lerner v. Fleet Bank, N.A., 459 F .3d 273, 290-91 (2d Cir. 2006)).

Glidepath Holding B.V. v. Spherion Corp., No. 04 Civ. 9758, 2007 WL 2176072 (S.D.N.Y. July 26, 2007), is equally unavailing.

---

[27] Defendants also cite SEC v. Goldsworthy, No. 06 Civ. 10012, 2007 WL 4730345 (D. Mass. Dec. 4, 2007), where the court cited the Tellabs "strong inference" formulation in an SEC enforcement action without any reasoned consideration of whether that standard should apply in that context. For that reason, it serves little function to guide my decision here.

There, the court acknowledged that Rule 9(b) requires a
complaint alleging fraud to state facts giving rise to a "strong
inference" of fraudulent intent, see id. at *10 (citing Shields,
25 F.3d at 1128), but applied the Tellabs formulation of that
standard because "[t]he Second Circuit has not defined what
constitutes a 'strong inference' in the common law fraud context
with the level of detail that the Supreme Court used in
Tellabs." Id. at *10 n.5. The court nevertheless proceeded to
analyze scienter guided by various Second Circuit precedents on
the issue, including those setting forth this Circuit's pre-
Tellabs Rule 9(b) standard. See id. at *12-15 (citing Lerner,
459 F.3d at 291, Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir.
1994), and Shields, 25 F.3d at 1128).

Neither decision addressed the instant question squarely,
let alone with the benefit of full briefing. In any event, to
the extent that either decision can be said to stand for the
proposition that the PSLRA "strong inference" standard applies
to all pleadings governed by Rule 9(b), I respectfully disagree
for the reasons stated above.

## B.    The Complaint Adequately States Scienter

### 1.    The Revenue Recognition Scheme

The facts alleged in the Complaint, taken as true,
constitute strong evidence supporting the inference that Nortel

35

personnel purposely recognized revenue improperly. They establish that (1) the Revenue Recognition Defendants knew that Nortel had prohibited bill and hold transactions in early 2000 because GAAP's requirements were too difficult to comply with (see Compl. ¶ 47); (2) the Revenue Recognition Defendants knew GAAP's requirements for recognizing revenue on bill and hold transactions (see id. ¶¶ 47-48, 50); (3) the Revenue Recognition Defendants knew that Nortel would not be able to meet revenue forecasts for the fourth quarter of 2000 (see id. ¶¶ 38-40, 43); (4) the Revenue Recognition Defendants established internal rules, through the internal guidance, for recognizing revenue on bill and hold transactions that disregarded certain of those requirements (see id. ¶¶ 51, 54-56); and (5) the Revenue Recognition Defendants knew that the internal rules were deficient (see id. ¶¶ 52, 59) but instituted them anyway to meet revenue forecasts (see id. ¶¶ 45, 68-70). Taken as true, such conduct constitutes strong direct evidence that the Revenue Recognition Defendants intentionally violated GAAP to misstate revenue.

These Defendants contest several points. They point out, for instance, that they were not familiar with GAAP requirements because "Nortel had been reporting its results under U.S. GAAP only since January 2000" (Dunn Mem. 9 (citing Compl. ¶ 37)) and observe that the decision whether to recognize revenue on bill

and hold transactions "involves significant judgment" (see id.).
From this, they argue, it is more plausible to conclude that
Pahapill distributed the vague internal guidance, not to enable
fraud, but because "she wanted Nortel staff to consult her on
U.S. GAAP revenue recognition." (See id. at 10.) The Revenue
Recognition Defendants also suggest that Nortel did not violate
SAB No. 101 by soliciting bill and hold transactions (see id.);
regardless, they argue that it is more plausible that those
solicitations were intended to inform Nortel's customers that it
was resuming the use of bill and hold transactions, not to
commit accounting fraud (see id. at 11). Finally, Defendants
argue that it is implausible that the bill and hold "scheme" was
designed to engineer revenue results when, in fact, Nortel
reversed several such entries, "thereby reducing revenue and
complying with GAAP." (See id. at 11-12.) Indeed, the Revenue
Recognition Defendants dispute the rationality of any
explanation whereby Nortel would want to reduce reported
revenues, "as if exceeding revenue expectations would have hurt
a telecommunications company in the midst of a major industry
downturn." (Id. at 12.)

    Evidence may ultimately bear out these Defendants'
suggestion that the conduct at issue was not intentional
misconduct. That fact issue, however, is irrelevant at this
stage of the litigation. The only question here is whether the

                                37

facts alleged in the Complaint, when taken as true, constitute "strong circumstantial evidence of conscious misbehavior or recklessness." Shields, 25 F.3d at 1128. As above, I conclude that they do.

This holding is not inconsistent with my decision in In re Bristol-Myers Squibb Securities Litigation, 312 F. Supp. 2d 549 (S.D.N.Y. 2004). In that case, among other things, a corporate defendant had restated its financial statements to reflect a changed accounting treatment for certain sales. See id. at 563-64. Alleging nothing more than that the application of the prior accounting treatment was fraud, plaintiffs filed a complaint that I dismissed for failure to state scienter under the PSLRA. Unlike the Complaint at issue here, the complaint in Bristol-Myers alleged no facts beyond the restatement to support the inference that the prior accounting error amounted to intentional misconduct. See id. at 568.[28] Indeed, that was not a case of competing plausible inferences: the facts alleged gave rise to only one inference. The same cannot be said about the Complaint here: Beatty and Pahapill were told by Nortel's

---

[28] Instead, plaintiffs relied on the argument that scienter could be inferred because "the fraud involved violations of the most fundamental principles of GAAP" and because "the GAAP provisions at issue [we]re simple[,] and their violation obvious." In re Bristol-Meyers, 312 F. Supp. 2d at 566 (quotations omitted). I disagreed, concluding that application of GAAP principles to the sales at issue was not so straightforward as to support a "strong inference" of intentional misconduct. See id. at 566-68.

outside auditors, as well as in-house compliance personnel, that
its accounting guidance for bill and hold transactions was
wrong. They nevertheless continued to make decisions with
respect to bill and hold transactions, with Dunn's approval,
contrary to GAAP requirements and solely for the purpose of
bringing in earnings numbers consistent with management's
forecasts. These facts are more than adequate to support the
inference that the Revenue Recognition Defendants consciously
chose a violative accounting scheme.

2. The Earnings Management Scheme

The facts alleged in the Complaint as to the earnings
management scheme, taken as true, establish that the Earnings
Management Defendants created, maintained and released reserves
selectively to meet earnings forecasts. (See Compl. ¶¶ 100-05,
118, 120-21, 133.) They establish that earnings management was
(and was intended to be) the sole purpose behind the reserves
accounting policy. (See id. ¶¶ 100-02.) The only question,
therefore, is whether the Complaint alleges facts establishing
that these Defendants "knew or should have known that the
reserves were inappropriate at the time they were established
(or reversed)." See, e.g., In re Bristol-Myers, 312 F. Supp. 2d
at 569.

The SEC does not allege, however, that the Earnings
Management Defendants knew, at the time of the earnings
management scheme, that the reserves accounting policy violated
GAAP. Absent are allegations that the Earnings Management
Defendants were made aware -- either by Nortel's outside
auditors or by internal compliance personnel -- that the policy
was inappropriate. Instead, the Complaint's allegations amount
to intentional disregard for GAAP accounting rules:  the
Earnings Management Defendants adopted an accounting policy for
particular reasons -- to manage earnings -- and ignored whether
that policy accorded with applicable accounting principles.
(See, e.g., SEC Opp'n 46, 48 ("[Nortel personnel] knew the
additional reserves . . . were not established for valid
business reasons, but instead were established solely to enable
them to reverse-engineer Nortel's [financial] results").)  That
is to say, the Complaint alleges an accounting scheme designed,
not as a bona fide attempt to comply with accounting principles,
but rather solely to orchestrate earnings. The precise
question, therefore, is whether this conduct, as it is alleged
in the Complaint, amounts to the kind of recklessness that is
sufficient to give rise to a "strong inference" of scienter.

I hold that it does. To adopt an accounting policy without
any regard for what is required under relevant accounting
principles amounts to "[a]n egregious refusal to see the

obvious." Chill, 101 F.3d at 269. Indeed, to do so with the intention of conveying an appearance of success despite knowledge of the contrary is the quintessence of an "intent to deceive, manipulate, or defraud." Hochfelder, 425 U.S. at 193; see also Aaron v. SEC, 446 U.S. 680, 691 (1980). Accounting for the financial results of a large publicly-traded company is a highly complicated task. It is subject to complex rules sprawling over pages from diverse sources of authority. And it is an immensely important task upon which rests, at least in part, the integrity of the securities markets. To undertake that task in complete derogation of the attendant legal and accounting guidelines constitutes the kind of "highly unreasonable" conduct "which represents an extreme departure from the standards of ordinary care . . . ." See In re Carter-Wallace, 220 F.3d at 39.

Again, the Earnings Management Defendants argue that non-culpable inferences "overwhelm any possible inference of fraud." (Dunn Mem. 13.) According to these Defendants, the fact that overbooking reserves was a long-standing policy, historically disclosed to Deloitte, "negates any suggestion that anyone at Nortel was ever aware that this practice violated GAAP." (Id. at 14.) Further, the fact that Nortel engaged Deloitte in the Summer of 2002 to evaluate the size of any then-existing excess reserves and further consulted with Deloitte in 2003 about its

release of reserves "utterly undermine[s] any inference of fraud." (Id. at 18.) As before, while arguing that these isolated factual allegations support competing inferences may ultimately bear fruit for these Defendants later in this litigation, at this stage they do nothing to undermine the conclusion that the allegations in the Complaint, taken as true, constitute strong circumstantial evidence of reckless behavior sufficient to support an inference of scienter.

Similarly, Defendants argue that the Complaint fails to allege which of the allegedly improperly accrued, maintained or released reserves were restated and, thus, reflected false statements. (See Dunn Reply 7-8; Hamilton Reply 5-6.) Instead, the Earnings Management Defendants offer facts outside the Complaint to support their argument that, in fact, much of the reserve activity was not improper: they allege that $222 million of the $303 million in reserves that were allegedly improperly maintained in the fourth quarter of 2002 were, in fact, released during that quarter (see Dunn Mem. 15) and that $66.3 million of the $151 million in reserves that were allegedly improperly accrued in that same quarter were found to comply with GAAP (see Dunn Reply 8).

That argument, however, is more properly suited to summary judgment. This motion tests only the sufficiency of the Complaint's allegations. Taking those allegations as true, the

Complaint demonstrates that reserves were accrued, maintained
and released selectively, in reckless disregard for governing
GAAP principles and solely to manage earnings. It identifies
material amounts from each quarter that the SEC alleges were the
subjects of that reckless program of accruing, maintaining and
releasing reserves. (See Compl. ¶¶ 94, 96, 103, 104-05, 123-24,
139, 141.) It alleges that, the First Restatement restated $948
million in reserves and that the Second Restatement restated a
further $746 million in reserves. (See id. ¶¶ 166, 170.) It
also alleges that the Second Restatement admitted that Dunn,
Beatty and Gollogly "were responsible for Nortel's improper use
of reserves in the second half of 2002 and first half of 2003"
(id.). Of course, while Rule 9 requires that the facts
constituting fraud be stated with particularity, the primary
purpose of that rule was "to afford defendant fair notice of the
plaintiff's claim and the factual ground upon which it is
based," Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990), and
not to act "as an insurmountable hurdle for plaintiffs to
overcome . . . ." H.A.B. Assocs. v. Hines, No. 90 Civ. 186, 1990
WL 170514, *2 (S.D.N.Y. Oct. 26, 1990) (citing DiVittorio v.
Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.
1987)). For that reason, I conclude that the Complaint states

with sufficient particularity what reserves it challenges as
improper and for what reason.[29]

## C.   Pleading Scienter as to the Individual Defendants

1.   The Revenue Recognition Scheme

As discussed above, the Complaint alleges that the Revenue
Recognition Defendants knew that Nortel's accounting of bill and
hold transactions violated GAAP but proceeded with that
accounting scheme nonetheless.  Those allegations, taken as
true, constitute direct evidence of conscious misconduct
sufficient to support the strong inference of scienter required
to state securities fraud.  Nevertheless, Defendants Dunn and
Beatty[30] each argues that the Complaint fails to include

---

[29] These Defendants also argue that, "[b]ecause the allegations
about revenue recognition and the booking and releasing of
reserves do not establish that there was a fraud, the
allegations concerning the defendants' statements to the public
and to Deloitte also should be dismissed." (Dunn Mem. 18-19.)
This argument fails because I conclude that the Complaint's
allegations establish that the challenged conduct at Nortel was
fraudulent.  Defendants either knew or recklessly disregarded
the possibility that the revenue recognition and earnings
management schemes violated GAAP.  They likewise possessed at
least the same degree of scienter regarding the falsity or
misleading nature of their statements about those schemes.

[30] In the papers accompanying her motion to dismiss, Pahapill
states that she "joins in the motions of her co-defendants to
the extent they are applicable to her, and moves to dismiss the
complaint based on failure to state a claim and plead fraud with
particularity, as set forth in the motion of Defendant Dunn."

(continued on next page)

44

allegations specific to him demonstrating that he acted with such scienter. (See, e.g., Beatty Mem. 8; Dunn Mem. 22.) I disagree for the reasons set forth below.

a.   Beatty and Pahapill

Among other things, the Complaint alleges that Beatty (together with Pahapill) initially banned the use of bill and hold transactions (see Compl. ¶ 47), that the two then discussed the requirements for recognizing revenue on bill and hold transactions with Deloitte (see id. ¶ 49), that Beatty (together with Pahapill) drafted the internal guidance that ignored certain criteria explained to them by Deloitte (see id. ¶ 51), that he (together with Pahapill) knew and approved the plan formulated by Nortel staff to solicit bill and hold transactions (see id. ¶¶ 55-56, 58) and that he (and Pahapill) were approached by compliance staff with the staff's concerns that the bill and hold transactions violated GAAP (see id. ¶ 59). Those allegations amply support an inference that Beatty and

(continued from previous page)

(Pahapill Mem. 21.)  Each argument as to the specificity of the allegations against individual Defendants is unique to that individual Defendant's brief, and, therefore, Pahapill's tag-along argument does not advance that theory on her behalf.  In any event, just as with Beatty, the facts alleged in the Complaint, taken as true, are sufficient to demonstrate her own intentional misconduct.

45

Pahapill knew Nortel's bill and hold accounting violated GAAP
and that they implemented it despite that knowledge.

In his defense, Beatty points out that the Complaint
alleges that Deloitte's warnings were conveyed only to Pahapill.
(See Beatty 10; see also Compl. ¶ 52.)  The additional factual
allegations in the Complaint, however -- understanding GAAP
requirements sufficiently to conclude that Nortel should ban
bill and hold transactions, discussing the requirements with
Deloitte and drafting the deficient internal guidance, and
persisting in the face of concerns expressed by Nortel
compliance staff that Nortel's bill and hold policy was not GAAP
compliant -- adequately support the inference that he knew the
Nortel's later bill and hold transactions were improper.  Beatty
also argues that facts not plead in the Complaint about
compliance personnel's concerns -- "who particularly raised
those concerns . . . whether anyone on the call disagreed with
Beatty's supposed directive, [or] whether the compliance
personnel followed Beatty's supposed directive" -- renders the
allegations about those concerns insufficiently specific to
support inferences adverse to him. (Beatty Mem. 12.)  While the
further facts he posits may ultimately support his argument, the
only facts I am currently permitted to consider are those
alleged in the Complaint.  Those allegations, as discussed

46

above, are sufficient to support a strong inference that Beatty
acted with scienter.

b.  Dunn

The Complaint alleges that Dunn was aware of weakening
internal revenue projections (see Compl. ¶¶ 39-40), that he knew
bill and hold transactions had previously been banned at Nortel
because their requirements were too difficult to satisfy (see
id. ¶ 47), that he knew the specifics of the accounting change
proposed by Beatty and Pahapill reintroducing bill and hold
transactions (see id. ¶¶ 53, 55) and that he participated in the
review and selective reversal of entries with the ambition of
engineering Nortel's results (see id. ¶ 70); see also SEC Opp'n
30-31).

Labeling the Complaint's allegations conclusory, Dunn
argues that, in fact, he was not aware of the details of the
plan to implement bill and hold transactions and that knowledge
of that plan cannot be imputed to him based solely on his then-
position as CFO. (See Dunn Reply 14-15 (citing City of Brockton
Retirement System v. Shaw Group Inc., 540 F. Supp. 2d 464, 473
(S.D.N.Y. 2008), In re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d
527, 550 (S.D.N.Y. 2007), In re Sotheby's Holdings, Inc., No. 00
Civ. 1041, 2000 WL 1234601, *7 (S.D.N.Y., Aug. 31, 2000) and
Duncan v. Pencer, No. 94 Civ. 321, 1996 WL 19043, *14 (S.D.N.Y.

47

Jan. 18, 1996)).) Further, even if he did know the specifics of the plan, Dunn argues that there are no allegations, like those with regard to Pahapill and Beatty, demonstrating that he knew the bill and hold transactions were improper under GAAP. (See Dunn Mem. 23.)

On both questions, however, the Complaint adequately pleads Dunn's recklessness. Dunn personally assured the public that Nortel, and specifically Optical, would reach projected targets for fiscal year 2000 (see Compl. ¶ 38), even while he was aware that Nortel's internal forecasts projected reduced revenues for those periods (see id. ¶¶ 39-41). Dunn, as CFO (see id. ¶ 26), aware of the importance of those targets (see id. ¶ 43), was aware that bill and hold transaction had been banned because GAAP requirements for such transactions were far too difficult to meet (see id. ¶ 47) and presided over the reintroduction of bill and hold transactions the accounting for which was not GAAP compliant (see id. ¶¶ 53, 55).[31] Moreover, he personally reviewed specific accounting entries, including bill and hold transactions, and reversed certain non-Optical entries to conform to his earlier revenue projections. (See id. ¶¶ 68-70.)

---

[31] Indeed, the contention that Dunn was unaware of the reintroduction of bill and hold transactions contradicts the Complaint's allegation that Dunn played an active role reviewing his subordinates' accounting for Nortel's results. (See Compl. ¶ 36.)

48

Given Dunn's alleged involvement in the bill and hold accounting change and knowing the impact that the change had on Nortel's results and his review of specific accounting entries, failure to investigate further the details and propriety of the bill and hold transactions by a person in Dunn's senior financial position constitutes "'an extreme departure from the standards of ordinary care,'" In re Carter-Wallace, 220 F.3d at 39, and "[a]n egregious refusal to see the obvious, or to investigate the doubtful." Chill, 101 F.3d at 269.

Dunn invokes SEC v. Todd, No. 03 Civ. 2230, 2006 WL 1564892 (S.D.Cal. May 30, 2006), but that decision does not support his cause. There, the court granted summary judgment for a defendant CEO on the ground that no reasonable fact finder could conclude that the CEO knew or should have known of certain accounting improprieties at his company. Id. at *7. The mere fact that the defendant knew of the transaction did not support an inference that he knew it violated GAAP, however, because he "was not an accountant, [and did not] have accounting expertise sufficient to challenge the treatment given to any particular transaction." Id. Moreover, upon learning that there might be something suspicious with the accounting at issue, the defendant in Todd "followed up with a team put together to vet the accounting, including the Vice President of Ethics and Compliance." Id. Such facts, particularly the formulation of

49

the vetting team, stand in stark contrast to the allegations in
the Complaint described above.

## 2. The Earnings Management Scheme

As discussed above, the Complaint alleges that the Earnings
Management Defendants disregarded accounting principles
governing the accrual, maintenance and release of reserves and,
instead, accrued, maintained and released those reserves solely
to manage earnings. Those allegations, taken as true, amount to
recklessness sufficient to support the strong inference of
scienter required to plead securities fraud. Defendants Dunn,
Beatty and Hamilton each argues that the Complaint fails to
include allegations specific to him showing that he exhibited
that level of recklessness. Again, I disagree for the reasons
set forth below.

### a. Dunn and Beatty

The Complaint alleges that Dunn encouraged the creation of
excess reserves generally (see Compl. ¶ 88), in particular to
reduce unanticipated increases in earnings in order to hew close
to forecasts (see id. ¶ 89). It alleges that Dunn and Beatty
knew Nortel was carrying excess reserves -- that is, reserves
not authorized by governing accounting principles -- in 2002
(see id. ¶¶ 96-97) and maintained those reserves for future

50

earnings management purposes (see id. ¶¶ 97). It further
alleges that they knew internal projections forecast
unanticipated increases in earnings (see id. ¶¶ 98-99) and that
they ordered such unanticipated earnings to be reduced through
the creation of further reserves (see id. ¶ 100). The Complaint
alleges that Beatty personally conveyed the substance of the
plan to various Nortel business unit heads. (See id. ¶ 102.) It
also alleges that Beatty, with Dunn's knowledge, further
manipulated reserve balances solely to compensate for a last-
minute accounting change. (See id. ¶ 105.) Then, when Dunn and
Beatty became aware that internal projections forecast
unanticipated decreases in earnings for 2003 (see id. ¶¶ 115,
117), the Complaint alleges Dunn authorized a coordinated plan
to release reserves company-wide in order to meet earnings
projections (see id. ¶¶ 118, 120). By this strategy, Nortel
personnel, including Dunn and Beatty, released reserves into
earnings in both the first and second quarters of 2003, enabling
Nortel to meet (or, in the second quarter, come close to) its
earnings forecasts. (See id. ¶¶ 123, 133, 139). These
allegations are more than adequate to show Dunn and Beatty's
personal participation in the formation and implementation of
the earnings management scheme, whose formation and
implementation I concluded above exhibited a reckless disregard
for proper accounting principles.

51

Dunn and Beatty both argue that the allegations in the
Complaint fail to show that either knew the reserves accounting
policy violated GAAP. (See, e.g., Dunn Mem. 25-26; Beatty Mem.
17.) Because I hold above that the Complaint adequately states
scienter by alleging facts constituting their reckless disregard
for the governing accounting principles, this argument is
irrelevant. Taking aim at this, Dunn offers the following:

> Companies can meet earnings targets in part by
> establishing or releasing reserves as long as those
> reserves were established or released in compliance
> with GAAP. The allegation that a defendant knew that
> earnings targets were met in part through reserves
> does not establish that the defendant knew that the
> accounting decisions establishing or releasing those
> reserves violated GAAP.

(Dunn Reply 17.) True enough, but the Complaint alleges more
than that earnings were met "in part" through reserve releases.
It alleges an intentional policy of accruing and releasing
reserves solely to meet earnings in reckless disregard for the
appropriate accounting treatment. And it alleges Dunn and
Beatty's personal involvement in the creation and co-ordination
of that plan. Accordingly, it passes muster under Rule 9(b).

b.   Hamilton

i.   Personal Jurisdiction

Before moving to the substance of his argument for
dismissal, I pause to consider and reject Hamilton's argument

52

that this Court may not exercise personal jurisdiction over him. (See, e.g., Hamilton Mem. 9-13.) "[T]he Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990) (citing Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998 (2d Cir.), cert. denied, 423 U.S. 1018 (1975)). This "requires an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." In re Parmalat Sec. Litig., 376 F. Supp. 2d 449, 453 (S.D.N.Y. 2005) (quotation omitted).

The minimum contacts analysis asks whether a defendant's contacts with the forum are such "that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002) (quotations and alterations omitted).[32] To support specific jurisdiction over a defendant based upon his or her conduct outside the United States, minimum contacts analysis will be satisfied (1) if those acts caused effects in the United States (2) that were the direct and foreseeable result of the actions abroad and (3) if

---

[32] Because "federal court jurisdiction is premised on a federal statute rather than diversity of citizenship, the forum applicable for contacts analysis is the United States . . . ." SEC v. Gonzalez de Castilla, No. 01 Civ. 3999, 2001 WL 940560, *3 (S.D.N.Y. Aug. 20, 2001) (citing SEC v. Knowles, 87 F.3d 413, 417 (2d Cir. 1996)).

53

the defendant knew or had good reason to know that the actions would have effects in the United States. See In re Parmalat, 376 F. Supp. 2d at 455. Here, the Complaint alleges that Hamilton prepared fraudulent financial data for consolidation into Nortel's financial statements. (See Compl. ¶¶ 107, 125, 143.) It alleges that those fraudulent financial data misled the investing public in the United States. (See, e.g., id. ¶¶ 112, 114, 130, 148.) It also alleges that Nortel was a public company traded on a U.S. exchange that periodically reported financial data to the SEC. (See id. ¶ 34.) Hamilton points to various factors in an effort to justify his conclusion that the alleged conduct could not reasonably have been anticipated to have had effects in the United States. (See Hamilton Mem. 10-11.) Those factors, however, cannot overcome the common-sense conclusion that an accounting fraud by a high-ranking Canadian officer of a large, Canadian public company traded in the United States would directly and foreseeably have effects in the United States. Hamilton's protestations of ignorance notwithstanding, someone in his position should know as much, and his arguments to the contrary are unpersuasive.

Under the "reasonableness" inquiry, a court must evaluate several factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's

interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996). Contrary to Hamilton's suggestion (see Hamilton Mem. 12), I see no serious burden imposed by the maintenance of this action in this forum. Furthermore, as Judge Swain convincingly described, the other factors weigh in favor of the maintenance of this action here:

> The interest of the United States in adjudicating the case is substantial because there is a need to protect American shareholders and insure the integrity of trading securities [on American stock exchanges]. The SEC has a strong interest in obtaining convenient and effective relief because it is charged with the duty to enforce securities regulations. The interstate judicial system has a substantial interest in providing efficient relief for securities violations and establishing a clear uniformity regarding the enforcement of SEC regulations.

SEC v. Alexander, No. 00 Civ. 7290, 2003 WL 21196852, *4 (S.D.N.Y. May 30, 2003). I agree. Exercising personal jurisdiction over Hamilton is reasonable, and, consequently, together with my conclusion above that the Complaint alleges sufficient minimum contacts with the United States to satisfy Due Process, I conclude that this Court may exercise personal jurisdiction over him.

ii.  Pleading Scienter as to Hamilton

The Complaint alleges that Hamilton responded to Beatty's
direction to determine the quantity and status of Nortel's
reserve balances by calculating the total excess reserves then-
existing on Optical's books (see Compl. ¶ 94) and that he was
told to accrue additional reserves in the fourth quarter of 2002
(see id. ¶ 102).  It further alleges that, upon receiving the
earnings roadmap from Beatty and Gollogly for the first quarter
of 2003, Hamilton told them that he intended to meet those
benchmarks by releasing reserves. (See id. ¶ 121-22.)  Then, in
the second quarter of 2003, the Complaint alleges that Hamilton
"took an active role in reviewing excess reserve levels . . .
and tracking [his] unit's ability to meet Corporate's targets as
the second quarter progressed." (Id. ¶ 140.)

In the same way that Dunn and Beatty recklessly disregarded
GAAP's requirements in creating Nortel's reserve release policy,
so too did Hamilton recklessly disregard GAAP's requirements by
following it.  Hamilton suggests that he had no reason to know
that maintaining and releasing reserves in the manner alleged
violated GAAP:  he was not an accountant and did not have the
accounting background to perceive the impropriety of that policy
(see Hamilton Reply 3), he knew Nortel's Comptroller would
review the propriety of the reserve releases he authorized at
Optical (see Hamilton Mem. 16), and assumed Deloitte had

56

approved Nortel's reserve release policy (see id.). But those facts simply reinforce his own recklessness: as Nortel's vice president of finance in charge of Optical (see Compl. ¶ 8), Hamilton was responsible for "preparing, analyzing and submitting" Optical's financial data for consolidation into Nortel's financial statements. (See Compl. ¶¶ 107, 125, 143.) Individuals charged with that duty must be held to know the principles that guide the performance of that duty. By submitting financial data that reflected reserves that were maintained or released for the sole purpose of managing earnings, as is alleged in the Complaint, Hamilton recklessly disregarded those principles.

## D.    Pahapill's Due Process Claim

Pahapill argues that certain remedies sought against her are time-barred because tolling agreements she signed were obtained in violation of fundamental rights secured to her by the Due Process Clause of the Fifth Amendment. (See, e.g., Pahapill Mem. 10-11.) In this regard, she relies almost entirely on the reasoning in Judge Kaplan's decision in Stein, 435 F. Supp. 2d at 356-65.[33]   In the part of that decision

---

[33] That action involved the so-called Thompson Memorandum, a policy statement promulgated by the Department of Justice

(continued on next page)

recently affirmed by the Court of Appeals, see Stein, --- F.3d at ----, 2008 WL 3982104 at *1, Judge Kaplan held that the so-called Thompson Memorandum and acts of prosecutors violated individual criminal defendants' Sixth Amendment right to counsel of their choice by causing KPMG, their employer, to cease paying their attorneys fees. See Stein, 435 F. Supp. 2d at 367. In an alternative holding, see U.S. v. Stein, 495 F. Supp. 2d 390, 409 n.80 (S.D.N.Y. 2007), Judge Kaplan also held that the Thompson Memorandum and acts of prosecutors violated substantive Due Process rights by infringing upon the fundamental right of those criminal defendants "to obtain and use in order to prepare a defense resources lawfully available to [them], free of knowing or reckless government interference." Id. at 361.

Pahapill now invokes Stein's Fifth Amendment holding, arguing that the SEC caused Nortel to stop paying her attorney's

(continued from previous page)

articulating principles to govern DOJ's discretion in indicting business organizations. See Stein, --- F.3d at ----, 2008 WL 3982104 at *1. Specifically, the Thompson Memorandum stated that prosecutors could consider "'a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees, . . . in weighing the extent and value of a corporation's cooperation.'" See id. (quoting Mem. from Larry D. Thompson, Deputy Att'y Gen., U.S. Dep't of Justice, Principles of Federal Prosecution of Business Organizations (Jan. 20, 2003), at VI.). Judge Kaplan found that the Thompson Memorandum and acts of assistant U.S. Attorneys caused KPMG to cease paying the legal fees of certain of its employees who were later indicted. See Stein, 435 F. Supp. 2d at 352-53.

fees in violation of her substantive Due Process rights. (See Pahapill Mem. 13.) She states that, because it was company policy to pay employees' attorneys fees (see Pahapill Aff.[34] ¶ 4), she retained counsel to represent her during the SEC's investigation of Nortel (see id. ¶ 7). When she requested confirmation that Nortel would continue paying that attorney's fees after Pahapill's voluntary resignation from Nortel (see id. ¶ 14), she was told by letter that Nortel would continue to pay but that it retained the option to cease payment to ingratiate itself to the SEC (see id.). Then, in December 2005, Nortel ceased paying Pahapill's attorney's fees, causing Pahapill to proceeded without representation. (See id. ¶¶ 16-17.)[35] She suggests that Nortel ceased paying her fees based on its belief that the SEC would consider that favorably in its decision whether to proceed against Nortel and, if so, what penalties to impose on Nortel. (See Pahapill Mem. 10, 13.)

In support of her suggestion, Pahapill points to the so-called "Seaboard Memorandum," see Sec. & Exch. Comm'n, Report of Investigation Pursuant to Section 21(a) of the Securities

---

[34] Reference is to the Affidavit of Mary Anne Poland, sworn to on November 9, 2007.

[35] While unrepresented, Pahapill signed two tolling agreements (see Compl. ¶¶ 21-23) that had the effect, argues counsel, of allowing the SEC now to avoid the statute of limitations applicable to the claims against her (see Pahapill Mem. 14).

Exchange Act of 1934 and Commission Statement on the

Relationship of Cooperation to Agency Enforcement Decisions,

S.E.C. Release No. 34-44969 (Oct. 23, 2001); see also Necheles

Decl.[36] Ex. C (Seaboard Memorandum), which she concedes is vague

(see Pahapill Mem. 9) but nevertheless pronounces "the civil

equivalent of the 'Thompson Memorandum'" (see id. at 8). Unlike

the Thompson Memorandum, however (see Necheles Decl. Ex. D

(Thompson Memorandum)), the Seaboard Memorandum does not mention

payment of legal fees. Pahapill also points to an SEC press

release announcing the settlement of accounting fraud charges

against Lucent Technologies Inc., see Sec. & Exch. Comm'n,

Lucent Settles SEC Enforcement Action Charging the Company with

$1.1 Billion Accounting Fraud, S.E.C. 04-67, 2004 WL 1090926

(May 17, 2004); see also Necheles Decl. Ex. F (Lucent Press

Release), calling attention to one of the paragraphs appearing

under the heading "Lucent's Lack of Cooperation." It states:

> After reaching an agreement in principle with the
> staff to settle the case, and without being required
> to do so by state law or its corporate charter, Lucent
> expanded the scope of employees that could be
> indemnified against the consequences of this SEC
> enforcement action. Such conduct is contrary to the
> public interest.

(Necheles Decl. Ex. F at 2.) Pahapill argues that the two

public statements created the impression "among corporate

---

[36] Reference is to the Declaration of Susan R. Necheles in
Support of Maryanne Poland's Motion, sworn to November 12, 2007.

America that [the] payment of legal fees of an employee who the SEC considered to be culpable of wrongdoing would be a factor that would be considered against a company in determining the severity of the penalties to be imposed against that company." (Pahapill Mem. 10.) I disagree, at the least because neither statement explicitly[37] mentions payment of legal fees.

Pahapill requests discovery and a hearing and asserts that, "[a]s occurred in the Stein case, discovery is likely to reveal facts that further prove that the government's tactics violated Poland's Fifth Amendment rights." (Id. at 15.) That request is denied because Pahapill has not made a sufficient showing that Nortel's termination of payment of her legal fees resulted from state action. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974) ("[T]he principle that private action is immune from the restrictions of the [Due Process Clause] is well established."). Affirming Judge Kaplan's decision in Stein, the Court of Appeals held that "[s]tate action is established . . . as a matter of law because the government forced KPMG to adopt its constricted Fees Policy." Stein, 2008 WL 3982104 at *13. Critical to its conclusion was the fact found by Judge Kaplan

---

[37] Pahapill does, however, argue that the reference in the Lucent press release to "indemnification" refers to legal fees. Even acknowledging that the reference could be to indemnification for liability and/or indemnification for legal fees, the Seaboard Memorandum and the Lucent press release two statements, without more, are insufficient to support the proposition.

that the personnel in the United States Attorney's Office "significantly encouraged KPMG to withhold legal fees from defendants upon indictment" and because "prosecutors became entwined in the control of KPMG" to ensure that the fees policy was enforced. Id. (quotation marks and alterations omitted).

Here, Pahapill alleges that a partner at the law firm of Wilmer Hale, "[William] McLucas[,] advised Nortel that Nortel must conduct an internal investigation to determine who at Nortel had been responsible for wrongdoing, fire those people and terminate payment of legal fees and report the company's findings to the SEC." (Pahapill Aff. ¶ 9.) She further alleges that "based on McLucas' advice, the Nortel board concluded that refusing to pay legal fees to certain former and current employees would put the company in a better position with the SEC." (Id. ¶ 12 (emphasis added).) In contrast, in Stein, the defendants alleged, by way of an affidavit from KPMG, that "the Thompson memorandum in conjunction with the government's statements relating to payment of legal fees affected KPMG's determination(s) with respect to the advancement of legal fees and other defense costs to present or former partners and employees." Stein, 2008 WL 3982104 at *5 (quoting Stein, 495 F. Supp. 2d at 405). Thus, even if I were to credit counsel's assertion that the Seaboard Memorandum, together with the Lucent press release, had the same effect as the Thompson Memorandum

(see Pahapill Mem. 8-9), there is no allegation that the SEC itself "significantly encouraged" Nortel to do anything or that SEC personnel became "entwined in the control" of Nortel regarding Nortel's decision to terminate payment of legal fees for certain former employees.[38] The Seaboard Memorandum and the Lucent press release, standing alone, are insufficient to constitute state action.

Therefore, Pahapill's request for discovery and a hearing into the circumstances of the termination of payment of her legal fees is DENIED.

---

[38] At oral argument, counsel for Pahapill suggested that Stein should also apply here because, unbeknownst to counsel at the time she filed her motion papers, Nortel was also the subject of a criminal investigation when payment of Pahapill's fees was terminated. This was significant, according to counsel, because it indicated that the Thompson Memorandum was also "at play" during Nortel's decision to cease paying Pahapill's legal fees. Again, however, counsel does not point to any facts indicating that Nortel's decision to terminate payment of Pahapill's legal fees "was the direct consequence of the pressure applied by the Thompson Memorandum and the USAO." Stein, 435 F. Supp. 2d at 353.

III. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss [dkt. nos. 17, 20, 24, 33, 35] are hereby DENIED. The parties shall confer and inform the Court by letter no later than 30 days after the date hereof how they propose to proceed.

SO ORDERED
Dated:     September 30, 2008
           New York, New York

LORETTA A. PRESKA, U.S.D.J.